JS 44 (Rev. 3/99) **CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Jerry Ryan

**DEFENDANTS**

303 CV 1769 M

Flowserve Corporation, C. Scott Greer and Renee J. Hornbaker

(b) County of Residence of First Listed Plaintiff  Tulsa County, OK
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Robert J. Hill
Claxton & Hill, PLLC
3131 McKinney Ave., Suite 700
Dallas, Texas 75204
214-969-9029

Attorneys (If Known)

RECEIVED
AUG - 7 2003
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

X 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff

(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/ Exchange |
| | | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| X 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | x☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause
Do not cite jurisdictional statutes unless diversity )

Section 10(b) and 20(a) of the Exchange Act, as amended, (15 USC Sections 78b and 78t and Rule 10b-5)

## VII. REQUESTED IN COMPLAINT:

X CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint·
JURY DEMAND:  X Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)·

JUDGE _____   DOCKET NUMBER _____

DATE  8/7/03

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUN _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

ORIGINAL

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

AUG - 7 2003

CLERK, U.S. DISTRICT COURT
By _____
Deputy

|  |  |
|---|---|
| JERRY RYAN, On Behalf of Himself And All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| FLOWSERVE CORPORATION, C. SCOTT GREER and RENEE J. HORNBAKER, | ) ) ) |
| Defendants. | ) ) ) ) |

CIVIL ACTION NO. _____

**3 0 3 C V 1 7 6 9    M**

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Flowserve Corporation ("Flowserve" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a federal class action on behalf of purchasers of the securities of Flowserve between October 23, 2001 and September 27, 2002, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. By the beginning of the Class Period, Flowserve was experiencing double-digit declines in its "aftermarket" sales of pumps and valves, primarily to the chemical and general industrial segments of its markets. In preparation for continued declines in its aftermarket sales and services, the Company idled several of its manufacturing plants. Flowserve withheld these adverse facts from the public while it continued to issue highly positive earnings statements and forecasts. In light of its declining revenues and earnings, the Company determined that in order to maintain its debt covenants, avoid default, and obtain favorable debt re-financing and re-pricing terms, among other things, it would need to obtain additional capital from the equity markets.

3. Consequently, Flowserve completed two public offerings during the Class Period, issuing over 16 million shares of its common stock to the unsuspecting investing public at artificially inflated prices. The $433.9 million in proceeds realized from the offerings was used to retire debt incurred in connection with Flowserve's prior acquisitions and to finance an additional acquisition. During this time, certain Flowserve executives, including defendant Hornbaker, engaged in a substantial insider selling campaign, disposing of over 98,000 shares of Flowserve common stock, at or near market highs, and realizing over $3.2 million in illicit proceeds.

4. The truth was revealed on September 27, 2002, when the Company warned of a 21% earnings shortfall for the quarter ending September 30, 2002, and cut its full year 2002 earnings guidance by over 60%, to $1.45 per share, from the $2.30 per share earnings guidance shared with investors during roadshow presentations promoting Flowserve's public offerings less than six months prior. Market reaction to the Company's announcement was swift and severe.

Flowserve shares fell over 38% to close at $8.70 on September 27, 2002, a decline of more than 75% from the Class Period high of $34.90 reached on May 2, 2002.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).   Flowserve maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

8.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9.      Plaintiff Jerry Ryan, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Flowserve during the Class Period and has been damaged thereby.

10.      Defendant Flowserve describes itself as "the largest manufacturer and aftermarket service provider of comprehensive flow control systems in the world." The Company is a New

3

York Corporation with its principal executive offices located at 222 W. Las Colinas Blvd., Suite 1500, Irving, Texas 75039.

11.    Defendant C. Scott Greer ("Greer"), at all times relevant to this action, served as the Company's Chairman, President and Chief Executive Officer.

12.    Defendant Renee J. Hornbaker ("Hornbaker"), at all times relevant to this action, served as the Company's Vice President and Chief Financial Officer.

13.    The defendants referenced above in ¶¶ 11 and 12 are referred to herein as the "Individual Defendants."

14.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects <u>via</u> access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

15.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Flowserve, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day opera-

4

tions of the Company at the highest levels and was privy to confidential proprietary information

concerning the Company and its business, operations, products, growth, financial statements, and

financial condition, as alleged herein. Said defendants were involved in drafting, producing,

reviewing and/or disseminating the false and misleading statements and information alleged

herein, were aware, or recklessly disregarded, that the false and misleading statements were

being issued regarding the Company, and approved or ratified these statements, in violation of

the federal securities laws.

16.    As officers and controlling persons of a publicly-held company whose common

stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the

New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal

securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and

truthful information with respect to the Company's financial condition and performance, growth,

operations, financial statements, business, products, markets, management, earnings and present

and future business prospects, and to correct any previously-issued statements that had become

materially misleading or untrue, so that the market price of the Company's publicly-traded

securities would be based upon truthful and accurate information. The Individual Defendants'

misrepresentations and omissions during the Class Period violated these specific requirements

and obligations.

17.    The Individual Defendants participated in the drafting, preparation, and/or

approval of the various public and shareholder and investor reports and other communications

complained of herein and were aware of, or recklessly disregarded, the misstatements contained

therein and omissions therefrom, and were aware of their materially false and misleading nature.

Because of their Board membership and/or executive and managerial positions with Flowserve,

each of the Individual Defendants had access to the adverse undisclosed information about

Flowserve's business prospects and financial condition and performance as particularized herein

and knew (or recklessly disregarded) that these adverse facts rendered the positive representa-

tions made by or about Flowserve and its business issued or adopted by the Company materially

false and misleading.

18.    The Individual Defendants, because of their positions of control and authority as

officers and/or directors of the Company, were able to and did control the content of the various

SEC filings, press releases and other public statements pertaining to the Company during the

Class Period. Each Individual Defendant was provided with copies of the documents alleged

herein to be misleading prior to or shortly after their issuance and/or had the ability and/or

opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the

Individual Defendants is responsible for the accuracy of the public reports and releases detailed

herein and is therefore primarily liable for the representations contained therein.

19.    Each of the defendants is liable as a participant in a fraudulent scheme and course

of business that operated as a fraud or deceit on purchasers of Flowserve common stock by

disseminating materially false and misleading statements and/or concealing material adverse

facts. The scheme: (i) deceived the investing public regarding Flowserve's business, operations,

management and the intrinsic value of Flowserve common stock; (ii) enabled the Company to

complete two public offerings of 16.3 million shares, thereby raising more than $433.9 million to

fund the Company's acquisitions and retire debt; (iii) enabled Flowserve insiders to sell their

personally-held Flowserve common stock generating millions in proceeds; and (iv) caused

plaintiff and other members of the Class to purchase Flowserve securities at artificially inflated

prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Flowserve between October 23, 2001 and September 27, 2002, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

21.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Flowserve common shares were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Flowserve or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

22.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

7

24. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by defendants' acts as alleged herein;

b. whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Flowserve; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

25. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

26. Flowserve operates in the "process control" industry. Process control companies manufacture and design devices that control the flow of substances as they move through various stages of production. Such devices include pumps, valves, seals and control systems. Process control devices are primarily used by the specialty chemical, petrochemical, and

8

water/wastewater industries, among others. The flow control system components the Company produces include pumps, valves and mechanical seals.

27.     At all relevant times, Flowserve managed its operations through three business segments: (1) Pump Division ("FPD"), which accounted for approximately 53% of the Company's sales during 2001; (2) Flow Control Division ("FCD"), which manufactures valves, accounted for 14% of 2001 sales;  and (3) Flow Solutions Division ("FSD") which manufactures mechanical seals and provides flow management services, FSD accounted for 33% of 2001 sales. Prior to 2002, the Company's maintenance, repair and overhaul ("MRO") revenues for each of the divisions were included in the Company's FSD business segment.

28.     According to the Company's 2001 Annual Report, Flowserve derived approximately half of its business from aftermarket sales and service – "a relatively *stable annuity stream* of revenues and profits." Aftermarket sales revenues are derived from sales of replacement pumps, valves and seals, as well as installation and maintenance services. Defendants' public statements often refer to aftermarket sales and services as "quick turnaround" or "book and ship" business due to their relatively short sales-cycle. Flowserve's original equipment manufacturing ("OEM") sales comprise the balance of the Company's product revenues and are related to longer term installation and construction-type projects. A key indicator of the Company's future sales trends are its "bookings," or incoming orders for which there are firm purchase commitments.   While Flowserve discloses bookings on at least a quarterly basis, it does not disclose a breakout between aftermarket and OEM bookings.  In general, the Company's average sales-cycle is less than twelve months.

29.     Flowserve was formed in 1997 as the result of a merger between BW/IP, Inc. ("BW/IP") and Durco International, Inc. ("Durco").  The merger created market concentrations

9

for the combined companies in the petroleum and chemical industries. During 2001, these two market segments accounted for approximately 53% of the Company's total product sales. Following the Company's formation, Flowserve encountered major integration problems, which significantly contributed to declining sales during both 1998 and 1999. The integration issues combined with the collapse of crude oil prices during this time, caused the Company's "organic," or internal revenue growth rates to continually decline. By the end of 1999, the Company's sales revenue had declined by over 11% to $1.0 billion since the Company's formation. As a result, the Company looked for external sources of revenue growth through acquisitions.

### Acquisitions Completed Prior To The Class Period

30.     During fiscal year 2000, the Company completed two major acquisitions: (1) Innovative Valve Technologies, Inc. ("Invatec"), a valve service company, for a purchase price of approximately $100 million, including debt assumptions of approximately $87 million; and (2) Ingersoll-Dresser Pump Co. ("IDP"), a pump manufacturer, for $775 million. Invatec had historical revenues of approximately $160 million, Invatec's operations were consolidated into the Company's FSD business segment. IDP's historical revenues exceeded $800 million during 1999.

31.     In connection with the IDP acquisition, Flowserve incurred over $1.1 billion in debt to fund the acquisition and integration program. The additional debt included $750 million in term loans under a senior secured credit facility (the "credit facility") and $375 million from the issuance of subordinated high-yield notes to the public. After the announcement of the IDP acquisition, the Company represented in its 1999 Annual Report that cash flow generated from operations, including cost reduction efforts and other "synergies" would be sufficient to service the debt.

32. As shown in detail above, Flowserve's debt structure was dramatically changed with the acquisition of IDP. Total debt rose above $1.1 billion. Under the Company's credit facility, Flowserve's interest costs were directly tied to the ratio of the Company's total debt to "earnings before interest, taxes, depreciation, amortization," excluding "other income" and certain "non-recurring costs" ("EBITDA"). The Company's ability to maintain this ratio at or below specific parameters, as defined under the Company's credit facility, resulted in lower interest margins on its term and revolving loans at certain repricing intervals. Thus at all relevant times, defendants were highly motivated to make it appear that the Company was performing and would continue to perform better than it actually was. Prior to the acquisition, total debt to "last twelve months" EBITDA (the "EBITDA Ratio") had been roughly 100%. The Invatec and IDP acquisitions caused a major deterioration in the EBITDA Ratio, bringing this ratio to nearly 5.5x in 2000. Additionally, the credit facility required the Company to meet or exceed certain financial measurement covenants, including leverage and debt service ratios, among others.

### Materially False and Misleading Statements
### Issued During The Class Period

33. The Class Period begins on October 23, 2001. On that date, Flowserve issued a press release announcing it financial results for the quarter and nine months ended September 30, 2001 and issued guidance for the fiscal year 2002, which called for a "40% to 50%" increase in earnings per share. Under the banner headline *"Flowserve Quarterly Earnings More Than Double Over Prior Year"*, the press release stated in relevant part as follows:

> [Flowserve] today announced net income of 38 cents a share, excluding special items, for the third quarter of 2001. This compares with a prior year pro forma net loss of 10 cents a share, and is more than double reported net income of 18 cents a share in the third quarter of 2000, calculated on the same basis.

11

Bookings increased 5 percent to $485.6 million in the third quarter of 2001 compared with pro forma $461.1 million in the prior year period. Excluding unfavorable currency translation, bookings for the third quarter of 2001 were 7 percent above pro forma bookings for the prior year period. Reported bookings were $399.2 million in the third quarter of 2000.

Defendant Greer commented on the Company's results and future prospects stating in pertinent part as follows:

"Flowserve performed especially well in the third quarter of 2001 in the face of some extremely difficult circumstances," said Flowserve Chairman, President and Chief Executive Officer C. Scott Greer. "The continuing improvements in results and margins clearly illustrate the benefits from the acquisition of IDP. This improvement was made despite the adverse impact the September terrorist attacks had on our quick turnaround business, where business temporarily stalled after Sept. 11. Were it not for this, our results would have been even better. Also, we're pleased to see progress in addressing integration inefficiencies within our pump operations."

"The increase in bookings primarily arose in our pump business, which we are delighted to see after our acquisition of IDP," Greer said. "This is especially notable since tighter security policies at many of our major customer sites in response to the terrorist attacks adversely impacted September bookings. *Overall, project activity in the petroleum, power and water markets remains healthy and should constitute a good indicator of our business for the future.* As of Sept. 30, our backlog was $756.4 million compared with $738.7 million as of June 30, and $659.3 million at year end 2000."

\* \* \* \* \*

"Presently, we anticipate full year 2001 earnings per share, excluding special items, will be within today's range of estimates as reported by First Call, assuming no further deterioration in our quick turnaround business," Greer said. *"Although we are still preparing our plans for next year, we initially expect full year 2002 earnings per share to be up 40 to 50 percent compared with 2001 earnings excluding special items."* [Emphasis added.]

34.    On November 2, 2001, Flowserve issued a press release announcing plans to conduct a public offering of approximately $150 million of common stock. The press release stated in relevant part as follows:

12

The offering is planned under Flowserve's effective shelf registration statement, which covers the issuance of up to $500 million of equity and debt securities.

The company expects to issue the new securities in mid-November. The lead manager will be Morgan Stanley and the co-lead manager will be Credit Suisse First Boston. Other members of the underwriting group are Banc of America Securities LLC, Bear, Stearns & Co. Inc., ABN AMRO Rothschild LLC and Robert W. Baird & Co.

35.     On November 16, 2001, Flowserve issued a press release announcing that it priced its public offering of 6.5 million shares of common stock at $23.50 per share and that the option to purchase an additional 975,000 shares was granted to underwriters for over-allotments. The Company further announced that it intended to use the proceeds to retire a portion of the high-yield debt incurred in connection with the IDP acquisition.  The press release stated in relevant part as follows:

The net proceeds of the offering will be used to repay debt, including the repurchase or redemption of a portion of the company's 12.25% Senior Subordinated Notes. The closing of the offering is expected to occur on Nov. 21, 2001 and is subject to customary closing conditions.

36.     The Company's Prospectus Supplement (the "November Prospectus") included in the Company's Registration Statement on Form S-3, filed with the SEC on November 16, 2001, made the following representations concerning the Company's "stable, consistent aftermarket revenue" streams:

[...] A large installed equipment base is critical to securing on-going incremental revenues as industry analysts suggest that a high percentage of the total lifecycle cost of a pump consists of aftermarket products and services, such as replacement parts, mechanical seals and maintenance. In addition, our installed base continues to require maintenance and the installation of replacement parts. *This provides us with a steady source of aftermarket revenues at higher margins than our original equipment business. When outsourced, a majority of replacement parts orders and aftermarket services business is awarded to the original equipment manufacturer. Our acquisition of IDP nearly tripled our installed pump base and we are continuing to leverage our extensive service network of*

13

*approximately 150 service and repair centers to cross-sell aftermarket products
and services to IDP's pump customers.* [Emphasis added.]

37.     The November Prospectus also represented that the IDP acquisition had materially

decreased the Company's dependence on certain critical industries, including the chemical

industry, for its future revenue growth and profitablility.  The November Prospectus stated in

pertinent part as follows:

> Our customers operate in many industries throughout the world, including
> petroleum, chemical, power generation and water resources. *Our acquisition of
> IDP significantly increased our pump market share in the power generation
> and water resources industries, both of which are expected to continue to grow
> faster than the overall flow control industry.* [Emphasis added.]

38.     Flowserve realized net proceeds of approximately $154 million from the sale of

stock in November 2001.

39.     On February 4, 2002, the Company issued a press release announcing its financial

results for the quarter and year-ended Decemebr 31, 2001.  Under the banner headline, "Results

Beat Last Year, Despite Economic Slowdown; *First Quarter 2002 EPS Forecast at 27 to 31

Cents; Maintains Full Year EPS Outlook at $1.90 to $2.30*," the press release stated in

pertinent part as follows:

> Full year 2001 sales were $1.92 billion, up 25 percent from 2000 reported sales of
> $1.54 billion. On a pro forma basis, sales were $1.96 billion in 2000. Unfavorable
> currency translation reduced 2001 sales by about 2 percent compared with the
> prior year pro forma.
>
> Full year 2001 bookings were $1.98 billion, up 30 percent from 2000 reported
> bookings of $1.52 billion. On a pro forma basis, bookings were $2.04 billion in
> 2000. Unfavorable currency translation reduced 2001 bookings by about 2 percent
> compared with the prior year pro forma.
>
> "Considering the disruption caused by the plant consolidations, the softer
> economy and the impact of Sept. 11 on our quick turnaround business, I am
> pleased with our results," said Flowserve Chairman, President and Chief
> Executive Officer C. Scott Greer. "I am particularly pleased with the level of



fourth quarter shipments from our pump plants, where we have been able to ship out the transferred backlog.[...]"

\* \* \* \* \*

Sales in the fourth quarter of 2001 were $539.3 million compared with $541.7 million in the year ago quarter. The fourth quarter, traditionally a strong shipping quarter, was impacted in 2001 by the decline in bookings related to MRO activities.

Bookings in the fourth quarter of 2001 were $452.9 million compared with reported bookings of $502.3 million in the year ago quarter. However, the company's backlog increased to $662.8 million at Dec. 31, 2001 from $659.3 million at the end of the prior year.

*"As we have said previously, the slowdowns related to Sept. 11 impacted our fourth quarter bookings, particularly our quick turnaround business," Greer said. "First quarter 2002 bookings to date appear to be returning to normal as daily order input patterns are starting to improve, which gives us confidence for our 2002 outlook.*[...]" [Emphasis added.]

\* \* \* \* \*

"Looking back at 2001, we said it would be a year of integrating IDP and capturing the synergies from that acquisition," Greer said. "As we enter 2002, we maintain our optimistic and upbeat outlook. Many of our key end-markets are poised for positive growth. In petroleum, upstream and downstream spending should remain at good levels, spurred by the ongoing quest to replace depleting wells and by mandated environmental requirements."

"In power, we enter the year with a solid backlog. In addition, there are many power opportunities outside the U.S. In the U.S., we expect new power project spending will be at a slower growth rate than in recent years. In water resources, demographic shifts, economic development and the need to improve existing infrastructure will continue to drive spending."

"Within the General Industry sector, the outlook for food and beverage, agriculture, and Navy and marine business remains positive," Greer continued. "The other areas within General Industry, such as metals, mining, and pulp and paper should improve with the economy."

"While we are not as enthusiastic about the chemical industry in the near term, we continue to believe that we will see the beginnings of a recovery in that sector later this year."

\* \* \* \* \*

15

"Since we acquired IDP, we have primarily talked about the hard synergies and the reduction of costs achieved by integrating the two companies," Greer said. "Entering the integration process, we also recognized that there were significant sales synergies. We are extremely bullish on the range of products we now possess -- a range that no other company can provide. This should lead us to capture more incremental sales and increased market share."

"While bookings in the first half of 2002 could be flat to slightly down, the outlook for second half bookings is up due to increased project activity, such as desulfurization," Greer said. "That said, we still feel strongly that with the harvesting of the full year of captured synergies and the operating improvements we have made, *we can expect to report first quarter 2002 earnings per share in the range of 27 to 31 cents compared with the year ago quarter's 10 cents, before special items, and reported net loss of 22 cents. We continue to expect to report full year 2002 earnings per share in the range of $1.90 to $2.30.* The estimates for 2002 include the effects of the SFAS 142 accounting pronouncement." [Emphasis added.]

40.     On or about March 19, 2001, Flowserve disseminated its 2001 Annual Report to its shareholders.  The Annual Report confirmed the previously announced financial results for the year-ended December 31, 2001 and made the following representations concerning the Company's operations and financial outlook:

In August 2000, we completed our purchase of the Ingersoll-Dresser Pump Co. and began the work of capturing real synergy savings.   In 2001, we committed ourselves to achieving a $75 million annual run rate in savings by year-end.

* * * * *

When we acquired IDP, we also promised to reduce our financial leverage to market levels as quickly as possible. In late 2001, we successfully issued 6.9 million shares of common stock with minimal dilution and *used the proceeds to strengthen our balance sheet by retiring approximately $133 million of high-cost debt. Our debt to-capital ratio declined to 71 percent at year-end.* We expect to make additional debt reduction in 2002.

* * * * *

Going forward, our business outlook remains exceptionally positive. Here are just a few of the reasons why:

– We are the leading pump manufacturer in all of our primary markets;

16



– We are the only major flow control company that offers customers one-stop shopping for pumps, valves, seals and service;

– ***We derive roughly half of our business from aftermarket sales and service a relatively stable annuity stream of revenues and profits*** [Emphasis added.]

41.     On March 21, 2002, Flowserve issued a press release announcing that it had reached a definitive agreement to purchase the flow control division ("IFC") of Invensys plc for approximately $535 million. The transaction was expected to close within 60 days. The press release stated, in pertinent part, as follows:

IFC is one of the world's foremost manufacturers of valves, actuators and associated flow control products. For the twelve months ending March 31, 2002, IFC expects to generate revenues of approximately $520 million and earnings before interest, taxes, depreciation and amortization (EBITDA), before restructuring expenses, of approximately $87 million.

"Integrating IFC into Flowserve's Flow Control Division should yield meaningful hard synergies, particularly in manufacturing operations, potentially generating annual cost savings in the area of $10-15 million," said Flowserve Chairman, President and Chief Executive Officer C. Scott Greer. "Due to timing, these projected synergies will not have a significant impact on 2002 results. The consolidation necessary to yield these projected savings, at an expected cost of three-times projected synergies, should be complete within about a year of closing."

The transaction is expected to be financed through a combination of debt and equity, following the company's objective of having no higher overall leverage after closing than the current level, as measured by the ratio of total debt to EBITDA.

"Based on our current financing plan and IFC's performance outlook, the acquisition of IFC should be neutral to slightly accretive to Flowserve's 2002 earnings, absent one-time charges, even without these potential synergies. In addition, this transaction should not have a significant impact on our leverage ratio under these parameters," Greer said.

"The addition of IFC will bolster our position among the world's elite valve manufacturers and will propel us into the position of second largest valve producer in the world. IFC brings a dozen well-recognized brands that will broaden Flowserve's offering of high quality valve products and related services.

These brands significantly deepen our offerings and applications to a diverse end-user marketplace. Now that we have completed the integration of IDP, the acquisition of IFC is the next step in our strategy to be a leading consolidator in the flow control industry," Greer said.

42.     On April 3, 2002, Flowserve issued a press release announcing plans to sell at

least 8 million common shares to the public to finance the previously-announced IFC acquisition.

The press release stated in relevant part as follows:

The company plans to issue 8.0 million shares of common stock, or 9.2 million shares if the underwriters fully exercise the over-allotment option granted to them by the company.

The company plans to use the net proceeds of the offering to fund a portion of the purchase price associated with the company's pending acquisition of Invensys plc's flow control division, which was announced on March 22, 2002. In the event the company does not complete this pending acquisition under the definitive purchase agreement, the net proceeds of the offering will be used to repay outstanding indebtedness under the company's existing senior credit facilities.

The joint lead [...] managers of the offering are Credit Suisse First Boston and Merrill Lynch & Co. The co-managers of the offering are Banc of America Securities and Bear, Stearns & Co.

A shelf registration statement with respect to these securities has been declared effective by the Securities and Exchange Commission.

43.     On April 5, 2002, Flowserve issued a press release pre-announcing its financial

results for the quarter ended March 31, 2002.  Under the banner headline, *"Flowserve Expects*

*Improved First Quarter Earnings,"* the press release stated in pertinent part as follows:

[...]based on preliminary quarterly financial information, it expects to report first quarter 2002 earnings per share in the range of 27 to 29 cents, in line with the company's earlier guidance.

In the first quarter of the previous year, the company reported a net loss of 22 cents a share. Before integration expenses, earnings per share were 10 cents in the first quarter of 2001. Under current accounting rules, including the new treatment of goodwill amortization, earnings per share before integration expenses would have been 19 cents a share in the first quarter of 2001.

18



The company said it expects first quarter 2002 sales to be flat to slightly up compared with $444.0 million in the first quarter of 2001.

***Sequentially, first quarter 2002 bookings are expected to be up around 5 percent compared with $452.9 million in the fourth quarter of 2001.*** First quarter 2002 bookings are expected to be down modestly primarily due to currency translation, compared with $496.3 million in the year ago quarter.

***"Preliminary information for the first quarter of 2002 supports our earlier view that activity is improving in several of Flowserve's businesses," said Chairman, President and Chief Executive Officer C. Scott Greer.*** [Emphasis added.]

44.     On April 16, 2002, Flowserve issued a press release announcing that it had finalized the pricing of its public offering at $31.50 per share (the "April Offering"). The press release stated in relevant part as follows:

The company will sell 8.0 million shares of its common stock at a price of $31.50 per share, and has granted the underwriters for the offering an over-allotment option to purchase an additional 1.2 million shares of its common stock within the next 30 days. The closing of the offering is expected to occur on April 22, 2002 and is subject to customary closing conditions.

The company plans to use the net proceeds of the offering to fund a portion of the purchase price associated with the company's pending acquisition of Invensys plc's flow control division (IFC), which was announced on March 22, 2002. The acquisition of IFC is subject to the satisfaction of customary closing conditions, including certain regulatory approvals. The company has received the required approval from the lenders under its existing senior credit facilities to consummate the acquisition of IFC and to use the proceeds of the common stock offering to fund a portion of the acquisition purchase price.

*   *   *   *   *

A preliminary prospectus supplement with respect to the proposed offering has been filed with the SEC.

45.     The Company's Prospectus Supplement (the "April Prospectus") included in the Company's Registration Statement on Form S-3, filed with the SEC on April 18, 2002, provided, among other things, the following representations concerning the pending acquisition of IFC:

19

IFC is one of the world's foremost manufacturers of valves, actuators and associated flow control products, including steam systems. IFC was formed in 1999 through the combination of the flow control divisions of BTR plc and Siebe plc. IFC's 12 operating companies have been selling flow control products for an average of approximately 85 years. IFC has a comprehensive portfolio of widely recognized and industry leading brands, offering high quality engineered solutions to its customers. ***IFC's customer base consists of businesses in several industries, including chemical, petroleum, power, water resources and pharmaceutical. IFC's sales mix by industry of end use for the fiscal year ended March 31, 2001, consisted of chemical (31%), petroleum (17%), power (16%), water resources (6%) and general industry and other (30%), which includes pharmaceutical (6%).*** IFC's revenue by geographic region for the fiscal year ended March 31, 2001, consisted of Europe, the Middle East and Africa (47%), the United States (40%), Asia (7%), Latin America (3%) and Canada (3%).

* * * * *

We expect to realize a number of significant strategic and competitive benefits as a result of the IFC Acquisition, including the following:

 ***Expanded Geographic and Market Opportunities.***  We expect the IFC Acquisition to provide us with opportunities to expand both our geographic and industry reach. IFC's significant global presence, particularly in Europe, will enhance our ability to capitalize on the trend among global customers toward consolidated sourcing of their flow control products. ***The IFC Acquisition will also make us the second largest manufacturer of valves in the world and provide us with a more balanced revenue mix by strengthening our presence in valve products in the petroleum, power, water resources, pharmaceutical and general industry markets.*** In addition, as IFC's historical focus has been more on valve products than on service, the IFC Acquisition will provide us with an opportunity to service the significant portion of IFC's installed base of valves whose service needs are currently being provided by third parties.

- Broad Line of Complementary Product Offerings.  The IFC Acquisition will provide us with a broad line of valve and actuator products to supplement our existing valve business by adding strong brands and an established customer base. IFC's portfolio of products complements our existing valve product offerings with limited overlap.

- Cost Savings and Manufacturing Efficiencies.  As a result of the IFC Acquisition, we expect to achieve cost savings of $10 million to $15 million per year primarily from the consolidation of manufacturing facilities. Despite the limited overlap in products, we believe these savings are possible due to the compatibility of the products and similarity in manufacturing processes. In

20

addition, cost savings will be achieved from the elimination of duplicative administrative functions and increased procurement opportunities. Due to timing, these projected synergies will not have a significant impact on 2002 results. The consolidation necessary to yield these projected savings, at an expected cost of three times projected yearly synergies, should be complete within approximately 18 months from the closing of the IFC Acquisition.

- Enhanced Research and Development Capabilities. We believe that IFC is one of the most innovative companies in the valve industry, particularly with respect to the application of automation technology in its products. We expect to leverage our combined research and development efforts to develop new and improved products that better meet the needs of our customers.

- Sell Our Existing Products to New Geographic Markets and to New Industries. We are continuing to expand our geographic and industry reach with existing products. IFC will expand our sales and manufacturing presence into new countries, allowing us to better serve existing customers on a global basis and reach new customers in these markets. We believe there are attractive growth opportunities in international markets, particularly in Latin America and Asia, and we will continue to leverage our global presence to further penetrate these markets. In addition, *IFC will expand our penetration of valve products, as measured by percentage of revenue, in the petroleum, power, water resources, pharmaceutical and general industry market segments, thereby reducing our reliance on the chemical industry for sales of valves and actuators.* [Emphasis added.]

46.     The April Prospectus described the Company's intended use of the proceeds of

the April Offering as follows:

The net proceeds to us from the sale of common stock in this offering are estimated to be $239.7 million, or $275.8 million if the underwriters' over-allotment option is exercised in full, after deducting underwriting discounts and commissions and estimated offering expenses payable by us. We intend to use the net proceeds from this offering, together with additional borrowings under our amended senior credit facilities, to finance the IFC Acquisition, to refinance our existing tranche B term loan facility, to repay a portion of the outstanding indebtedness under our existing senior credit facilities and to pay transaction costs and expenses.

47.     The April Prospectus included the Company's previously announced "improved"

first quarter 2002 earnings and presented historical and "pro-forma" consolidated financial

21

information for the Company.  The "pro-forma" financial information was presented for the year

ended December 31, 2001, and gave effect to the IFC acquisition, the financing of the acquisition

and certain other debt reductions, *as if each had occurred as of January 1, 2001.  As a result*

*Flowserve's "pro forma" 2001 EBITDA was increased by 287% over the Company's actual*

*reported results during that year.*

48.     The April Prospectus included the following representations related to

hypothetical "economic downturns" in certain of the Company's market segments:

> The businesses of most of our industrial customers, particularly refineries,
> chemical companies and power plants, are, to varying degrees, cyclical and have
> historically experienced periodic downturns. Margins in those industries are
> highly sensitive to demand cycles, and our customers in those industries
> historically have tended to delay large capital projects, including expensive
> maintenance and upgrades, during economic downturns. For example, due to the
> simultaneous decline in oil and chemical prices in 1998 and 1999, many of our
> key customers significantly reduced their capital spending, which resulted in
> declines in our revenues and net earnings during those years. These industry
> downturns have been characterized by diminished product demand, excess
> manufacturing capacity and subsequent accelerated erosion of average selling
> prices in the flow control industry. Therefore, *any significant downturn in our*
> *customers' markets or in general economic conditions could result in a*
> *reduction in demand for our products and services and could harm our*
> *business.* [Emphasis added.]

49.     During April 2002, the Company completed the April Offering realizing over

$279.9 million in net proceeds.

50.     On April 22, 2002, the Company issued a press release announcing its financial

results for the quarter ended March 31, 2002.  The Company issued earnings guidance for the

second quarter ending June 30, 2002 of $0.46 to $0.50 per share, and reiterated its full year 2002

guidance of $1.90 to $2.30 per share.  The Company reported earnings in-line with its "improved

first quarter results", pre-announced just two weeks prior to the Company's stock offering.

Defendant Greer commented on the Company's results, in relevant part, as follows:

> "Flowserve posted solid results in the first quarter of 2002," said Chairman, President and Chief Executive Officer C. Scott Greer. "I am pleased with our growth in earnings despite relatively flat sales. I am also gratified by how these results confirm that we have put the IDP integration costs behind us and that we are realizing the IDP synergy benefits. ***Moreover, I am encouraged by the sequential quarterly increase in bookings. This increase in bookings supports our view that activity in some of our key markets is improving*** following the slowdown related to Sept. 11. With this as a backdrop, and following our successful equity offering, we are eager to complete our pending acquisition of Invensys plc's Flow Control Division (IFC) in early May and take advantage of the many benefits it should provide our customers and shareholders."
>
> \* \* \* \* \*
>
> "We remain cautious on the chemical and general industrial sectors," Greer continued. "That said, ***we are noticing that chemical plant utilization is edging slightly higher, which we hope is a precursor of improving business conditions. At this time, we feel that this sector has bottomed out. Nonetheless, we are not looking for a meaningful recovery in 2002 and are managing our business accordingly.*** As for the general industrial sector, while overall economic activity is improving, it is too early to say that we are seeing a meaningful upturn in this area." [Emphasis added.]
>
> \* \* \* \* \*
>
> "In all, we remain upbeat and optimistic about Flowserve's future," Greer said. ***"We are seeing improving business conditions in some of our businesses. We should continue to reduce debt and strengthen our balance sheet. Our continuous improvement initiatives are beginning to gain momentum.*** We recently completed a successful equity offering that will help us complete our pending acquisition of IFC. This transforming acquisition will propel Flowserve into position as the world's second largest provider of valves, complementing our similar position in pumps. We couldn't be more excited about this transaction. All of these are key elements of our strategy to make Flowserve one of the world's top industrial companies while building value for our shareholders." [Emphasis added.]

51.     On May 2, 2002, the Company issued a press release announcing the completion

of the IFC acquisition. The press release stated in relevant part as follows:

"The integration of IFC into Flowserve will begin immediately," Greer said. "We have already identified opportunities for synergies and cost savings that should positively impact the combined businesses and should have increasing benefits in future periods. Moreover, we expect this acquisition to be neutral or mildly accretive to 2002 earnings, excluding one-time charges, even without these synergies."

* * * * *

"We are pleased by the positive investor response to our common stock offering, which we view as a vote of confidence in Flowserve's business model," Greer said. "Also, we appreciate the support of our lenders, who refinanced a significant portion of our existing debt and lent us additional funds, both at a lower effective rate, to finance this growth. [...] We are extremely excited about the significant opportunities this acquisition creates for Flowserve, our customers, and our shareholders," Greer said.

52.     On June 5, 2002, the Company issued a press release announcing the progress of restructuring efforts related to the IFC acquisition. The press release stated in relevant part as follows:

> [... the] acquisition of the Invensys Flow Control division (IFC), which was finalized on May 2, 2002, the company today announced initiatives to help realize the previously announced $ 10-to-15 million in estimated annual synergies expected by December 2003. The company said it would close six facilities and reduce related employment by approximately 450 positions. The majority of these reductions are planned to occur before March 2003. The company expects to complete all consolidation actions by December 2003. ***The acquisition of IFC was primarily a complementary transaction that significantly broadened our offering of valve products and service, simultaneously propelling Flowserve into position as the world's second largest valve producer,*** " said C. Scott Greer, chairman, president and chief executive officer of Flowserve Corporation. "To help us meet our announced plan to our shareholders to reduce costs and grow our business, we must leverage and optimize the resources of the combined companies.[...]"

53.     The statements referenced above in ¶¶ 33, 36, 37, 39-41, 43, 45-48, and 50-52 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

(a) that the Company's declining revenues and earnings during 2001 and 2002 would have caused the Company to violate its loan covenants but for its public stock offerings, which enabled the Company to reduce its debt, obtain favorable interest rates and debt refinancings from lenders, and Flowserve to fund the acquisition of IFC, among other things;

(b) that demand for the Company's products had materially declined, especially its aftermarket sales or "quick-turnaround business" resulting in revenue and earnings shortfalls;

(c) that the Company's recent acquisitions, including IDP and IFC, had not materially altered the Company's dependence on revenue streams from the Chemical industry, or further stablilized its aftermarket revenue streams for its pump and valve business through significant cross-selling opportunities, among other things;

(d) that the Company's reorganizations, downsizing and facility closures, following its acquisition of Invatec, IDP and IFC had failed to eliminate excess manufacturing capacity resulting in the material erosion of the Company's gross margins and earnings;

(e) that the Company had severe and continuing integration problems following acquisition of Invatec, resulting in a disruption of the Company's service and maintenance operations and contributing to the decline in Flowserve's high margin service revenues, eventually necessitating the reorganization of the Company's service business segment; and

(f) based on the foregoing, defendants' opinions, projections and forecasts concerning the Company and its operations were lacking in a reasonable basis at all times.

### The Truth Begins To Emerge

25

54.     On July 22, 2002, after the close of the market, Flowserve issued a press release

announcing its financial results for the second quarter and six months ended June 30, 2003.   The

press release stated in relevant part as follows:

> Results for the second quarter of 2002 primarily reflect weakening in the quick
> turnaround business, particularly the chemical and industrial sectors, specifically
> affecting industrial pumps, manual valves and service. Furthermore, quarterly
> revenues had a higher proportion of project business compared with the prior year
> period. Project business generally has thinner margins than other types of
> business. Currency translation also had an unfavorable impact in the second
> quarter of 5 percent on operating income. These unfavorable factors were partially
> offset by the $4.7 million, or 7 cents a share, benefit of compliance with SFAS
> 141 and 142.
>
> \* \* \* \* \*
>
> "Of particular concern is the deterioration of the quick-ship business in the
> chemical and industrial sectors. At the beginning of the year, we had expected this
> business to be flat to slightly down for the year. During the second quarter,
> bookings for this sector experienced double-digit year-over-year declines.
> Considering the importance of this business to our margins, this type of volume
> decline coupled with our planned inventory reductions will make profit
> improvement difficult.
>
> "While there has been an increase in the level of inquiries, we don't foresee much
> in the way of real spending increases until 2003. *As a result of the decline in
> chemical and industrial bookings in the second quarter coupled with the
> resulting drop in backlog, it is only prudent to estimate earnings per share,
> excluding special items, in the range of 38 to 43 cents in the third quarter of
> 2002 and $1.70 to $1.90 for the full year," Greer said.*
>
> *Separately, the company said it has realigned its operating segments beginning
> with the third quarter of 2002. Under this new organization, the Flow Solutions
> Division will include Seals only, with the company's pump and valve service
> businesses being included as appropriate in the Flowserve Pump Division and
> Flow Control Division.* [Emphasis added.]

55.     On July 23, 2002, the Company held an earnings conference call with market

analysts, attended by defendants Greer and Hornbaker, among others.   Defendant Greer

commented on Flowserve's "bookings" – a key indicator of the Company's future sales trends –

26

in several of Flowserve's critical market segments, including chemical and industrial stating in

pertinent part as follows:

> Actually, bookings in the chemical and industrial business declined in the quarter. In fact, the bookings -- the decline in bookings for comparable operations, excluding the IFC (ph) -- the impact of IFC (ph) was 9 percent. While, overall comparables was down 9 percent, ***chemical and industrial business, according to the Hydraulic Institute, has shown a 25 percent decline which is in line with our experience.***
>
> The second quarter was spared the full impact of this bookings decline due to the backlog going into the quarter. However, we do not have the luxury of a strong backlog in the chemical and industrial sectors going into the second half of the year. ***All signs are becoming more positive all the time. Chemical plant utilization is showing improvement. Pricing, for many chemicals, is showing strength and key large public chemical companies are posting improved results.***
>
>                 \* \* \* \* \*
>
> We had based our previous financial estimates and public statements on the assumption that our chemical and general industrial business would be basically flat or slightly down this year and we could live with that. But, what turns out to be happening, is the condition, instead, seems to be weaker, contrary to what we saw just three months ago.
>
> Right now, I'd like to take a few minutes to give a brief overview of some of our key end-markets. ***Our petroleum related business had really been shouldering much of the load of late. On the upstream side, we're seeing a number of projects being funded with few delays.*** In North America we're seeing more project activity in Canada for pipelines and tar sand than in the United States. Much of the activity is for offshore production facilities in various parts of the world. In general, much of the upstream activity is focused in West Africa, Asia and the Middle East.
>
> On the downstream side, we find the activity has been pretty much flat. I don't anticipate refineries will look to increase their capacity until chemicals -- the chemical industry requires more feedstuffs. De-sulfurization remains a bright spot on the downstream side. We are getting some bookings now, but it's looking like the anticipated implementation date for the new clean fuel standards are being pushed out a bit to 2005 and 2007 for gas and diesel, respectively.
>
> Nonetheless, by our count, about a hundred US refineries are currently, or soon, to begin undergoing some type of de-sulfurization related activity. ***In sum, we're very upbeat about our petroleum related business.***

* * * * *

*Given the worse than expected booking climate in the chemical and industrial area, we expect third quarter earnings to be in the range of 38 to 43 cents per shares with the full year at 170 t0 190 excluding any special items associated with the IFC (ph) acquisition.*

To put this in perspective, the bottom range remains higher than 2002, even with FAS-141 and 142 adjustments and the higher end is in line with previous guidance. Needless to say, if quick turnaround business in chemical and industrial markets improve only to somewhere within the lower levels of 2001, we would increase our full year projections accordingly. [Emphasis added.]

Defendant Hornbaker described the Company's declining margins, and the Company's exposure

to declining demand trends resulting in idle plant capacity:

Q2 gross profit was 182 million up 17 percent from last year, while gross margin declined 280 basis points to 30.7 percent. Gross profit was negatively impacted by the 2.6 million of purchased accounting adjustment from the required write up of inventory which runs through cost of sales. *Excluding IFC (ph) Q2's gross profit was 156.8 million, slightly above last year, while gross margin declined 240 basis points.* Gross profit was also negatively impacted by the lower mix of short turnaround and MRO (ph) business, including lower volumes of chemical and industrial process pumps, manual valves and service and repair related activities. *In addition, gross profit was adversely affected by the under-absorption at several facilities that were working down inventories of finished goods.* [Emphasis added.]

Analysts questioned defendant Greer regarding the stark contrast between the Company's second

quarter operating results and the "road show" presentations made earlier during the quarter

promoting the Company's stock offering:

MICHAEL SCHNEIDER (ph), ROBERT W. BAIRD: Robert W. Baird. Maybe you could give us a sense, just first looking through the quarter? *You mentioned that you saw some up tick in the general industrial and the chemical business in March, Scott, but, did it precipitously fall off as you went through the quarter? Because you were on the road in April for the road show, you discussed IFC (ph) in May, it just seems to me something happened late in the quarter that came as a surprise.*

SCOTT GREER: Yeah, normally, when you look at how our quarter bookings are, usually they are stronger at the end of the quarter than the beginning of the

28

quarter. The salesmen are trying to make sure they book things as they originally projected it. So what we saw is it was getting back in line from a more normal down market at the very end of the first quarter. *What we saw is a continued decline* and actually not foreseen by our salespeople. They actually thought, talking to the customer, that they were going to bring in some more quick turnaround. And remember, that is a major part of every quarter. It's not just in our backlog and it didn't come through.

Then checking with what all of our competitors are saying, it seems to be the same type of sluggishness there. So what we're looking at going forward, well, you know, we were able to handle in Q2, our concern if it continues at this lower rate into Q3 and on, is really why we're taking a more conservative outlook. Again, what I do want to stress, you know, if we're being overly conservative, you know, we'll move the guidance back up.

RENEE HORNBAKER: *Mike, all of our internal forecasts were for sales to be up in June and they just weren't and they just weren't and they just didn't materialize --*

SCOTT GREER: Bookings you mean?

RENEE HORNBAKER: Bookings, I'm sorry, bookings, just didn't materialize as we expected them to do.

MICHAEL SCHNEIDER (ph): OK and then I guess what's most curious to me is the disconnect. We have seen improvements in the utilization rates at chemical plants. We have seen better earnings, obviously, out of the chemical companies, yet you don't see it in the daily activity and these plants are running at higher utilization rates, by definition the MRO (ph) work should be higher?

SCOTT GREER: Right we --

MICHAEL SCHNEIDER (ph): (inaudible) disconnect?

SCOTT GREER: What I think it is that part of your quick turnaround is -- you've got to think of two kinds of projects. There are the big major projects where you're doing a major installation or a major upgrade. There are small projects which are almost similar to MRO ["Maintenance Repair and Overhaul"] where they're going to work on a particular loop. Where they're going to do some upgrades during the maintenance, and I think it's that part which they continue to look at very cautiously. [Emphasis added.]

29

Defendant Greer also commented on the Company's prior, but undisclosed, decision to idle

certain of the Company's chemical pump and valve plants in anticipation of declining demand

and sales:

> SCOTT GREER: And also remember, Mike, part of what we're doing in the
> earnings is we still are going to drive that inventory. *We're not letting them build.*
> *We could've, actually, been at the top end of the range this quarter if we'd have*
> *let the chemical plants build in anticipation of better business. We're not doing*
> *that so we-re -- we're getting hit but under-absorption across our businesses.*
> *Both in our valve and our pump business in particular* because we're going to
> continue to guide down inventory[...] [Emphasis added.]

56.     In reaction to defendants' announcement, the price of Flowserve common stock

fell over 37%, closing at $14.55 per share on July 23, 2002.  The statements referenced above in

¶¶ 54 and 55, however, were each materially false and misleading as they continued to conceal

the true operating condition of the Company.

### The Truth Is Revealed

57.     On September 27, 2002, the Company issued a press release announcing that it

expected to report an earnings shortfall of $0.08 to $0.11 per share for the third quarter ending

September 30, 2002.  The press release stated in relevant part as follows:

> Citing market-related factors, [Flowserve]today lowered its 2002 earnings
> estimates to 30 to 32 cents for the third quarter and $1.45 to $1.55 for the full
> year, excluding special items, which relate to the May 2002 acquisition of the
> Invensys Flow Control Division (IFC). The company's previous guidance had
> been 38 to 43 cents for the third quarter and $1.70 to $1.90 for the full year, on the
> same basis.
>
> *These market-related factors include unanticipated further deterioration of*
> *typically higher margin book-and-ship, or quick turnaround, business,*
> *particularly in the chemical, power, and general industrial sectors, and an*
> *unfavorable mix of lower margin project business.* [Emphasis added.]

Defendant Greer commented on the Company's future prospects:

30

"In some of our end-markets, particularly upstream petroleum and water, bookings have held up," Greer added. "Additionally, I remain optimistic about the company's prospects for 2003 and beyond. We are continuing to make important progress in strengthening the company's balance sheet and operational processes. That said, ***we are not comfortable at this point projecting more than marginal earnings improvement in 2003***, unless markets start to improve. And, we believe they will." [Emphasis added.]

58.     Market reaction to the Company's disclosures was swift and severe as the price of

Flowserve common stock fell over 38% closing at $8.70 per share on September 27, 2002, a

decline of more than 75% from the Class Period high of $34.90 reached on May 2, 2002.

## Undisclosed Adverse Information

59.    The market for Flowserve's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Flowserve's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Flowserve securities relying upon the integrity of the market price of Flowserve's securities and market information relating to Flowserve, and have been damaged thereby.

60.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Flowserve's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, including, inter alia:

(a) that the Company's declining revenues and earnings during 2001 and 2002 would have caused the Company to violate its loan covenants but for its public stock offerings, which enabled the Company to reduce its debt, obtain favorable interest rates and debt refinancings from lenders,  and Flowserve to fund the acquisition of IFC, among other things;

(b) that demand for the Company's products had materially declined, especially its  aftermarket sales or "quick-turnaround business" resulting in revenue and earnings shortfalls;

(c) that the Company's recent acquisitions, including IDP and IFC, had not materially altered the Company's dependence on revenue streams from the Chemical industry, or further stablilized its aftermarket revenue streams for its pump and valve business through significant cross-selling opportunities, among other things;

32

(d) that the Company's reorganizations, downsizing and facility closures, following its acquisition of Invatec, IDP and IFC had failed to eliminate excess manufacturing capacity resulting in the material erosion of the Company's gross margins and earnings;

(e) that the Company had severe and continuing integration problems following acquisition of Invatec, resulting in a disruption of the Company's service and maintenance operations and contributing to the decline in Flowserve's high margin service revenues, eventually necessitating the reorganization of the Company's service business segment; and

(f) based on the foregoing, defendants' opinions, projections and forecasts concerning the Company and its operations were lacking in a reasonable basis at all times.

61. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Flowserve's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Flowserve and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

33

### Additional Scienter Allegations

62.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Flowserve, their control over, and/or receipt and/or modification of Flowserve's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Flowserve, participated in the fraudulent scheme alleged herein.

63.     While Flowserve insiders were issuing false and misleading statements about Flowserve and its business, the Company completed two public offerings of approximately 16.3 million shares realizing over $433.9 million in net proceeds.

64.     Defendants' fraudulent scheme alleged herein enabled defendant Hornbaker and other Flowserve insiders to sell their personally-held Flowserve common stock to the unsuspecting public at artificially inflated prices, as set forth in the chart below:

| Insider | Date of Sale | Shares | Price | Proceeds |
|---|---|---|---|---|
| Renee J. Hornbaker, CFO | 4/25/02 - 4/30/02 | 50,000 | $33.040 | $1,652,000.00 |
| Cheryl D. McNeal, Officer | 4/26/2002 | 13,227 | $33.070 | $437,416.89 |
| George A. Shedlarski | 4/24/2002 | 10,000 | $32.220 | $322,200.00 |
| Ronald F. Shuff, Secretary | 4/26/2002 | 25,000 | $33.180 | $829,500.00 |
| **Grand Total** | | **98,227** | **$33.00** | **$3,241,116.89** |

34

**Applicability Of Presumption Of Reliance:**
**Fraud-On-The-Market Doctrine**

65. At all relevant times, the market for Flowserve's securities was an efficient market for the following reasons, among others:

(a) Flowserve's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Flowserve filed periodic public reports with the SEC and the NYSE;

(c) Flowserve regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Flowserve was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

66. As a result of the foregoing, the market for Flowserve's securities promptly digested current information regarding Flowserve from all publicly available sources and reflected such information in Flowserve's stock price. Under these circumstances, all purchasers of Flowserve's securities during the Class Period suffered similar injury through their purchase of Flowserve's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

67.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

defendants are liable for those false forward-looking statements because at the time each of those

forward-looking statements was made, the particular speaker knew that the particular forward-

looking statement was false, and/or the forward-looking statement was authorized and/or

approved by an executive officer of Flowserve who knew that those statements were false when

made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

68.    Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

69.    During the Class Period, defendants carried out a plan, scheme and course of

conduct which was intended to and, throughout the Class Period, did: (I) deceive the investing

public, including plaintiff and other Class members, as alleged herein; (ii) enable the Company to

complete two offerings of its common stock raising hundreds of millions of dollars; (iii) enable

36

Flowserve insiders to sell millions of dollars of their personally-held Flowserve common stock to the unsuspecting public at artificially inflated prices; and (iv) cause plaintiff and other members of the Class to purchase Flowserve's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

70.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Flowserve's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

71.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Flowserve as specified herein.

72.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Flowserve's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Flowserve and its business operations

37

and future prospects in the light of the circumstances under which they were made, not mislead-

ing, as set forth more particularly herein, and engaged in transactions, practices and a course of

business which operated as a fraud and deceit upon the purchasers of Flowserve securities during

the Class Period.

73. Each of the Individual Defendants' primary liability, and controlling person

liability, arises from the following facts: (I) the Individual Defendants were high-level executives

and/or directors at the Company during the Class Period and members of the Company's man-

agement team or had control thereof; (ii) each of these defendants, by virtue of his

responsibilities and activities as a senior officer and/or director of the Company was privy to and

participated in the creation, development and reporting of the Company's internal budgets, plans,

projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and

familiarity with the other defendants and was advised of and had access to other members of the

Company's management team, internal reports and other data and information about the Com-

pany's finances, operations, and sales at all relevant times; and (iv) each of these defendants was

aware of the Company's dissemination of information to the investing public which they knew or

recklessly disregarded was materially false and misleading.

74. The defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

for the purpose and effect of concealing Flowserve's operating condition and future business

prospects from the investing public and supporting the artificially inflated price of its securities.

As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

75.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Flowserve's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Flowserve's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Flowserve securities during the Class Period at artificially high prices and were damaged thereby.

76.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Flowserve was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Flowserve securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

77.   By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

78.   As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

79.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.   The Individual Defendants acted as controlling persons of Flowserve within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

40

81.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

82.     As set forth above, Flowserve and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: August 7 , 2003

By:_____
**CLAXTON & HILL, PLLC**
**ROGER F. CLAXTON**
Texas Bar No. 04329000
**ROBERT HILL**
Texas Bar No. 09652100
700 McKinney Place
3131 McKinney Avenue, LB-103
Dallas, TX 75204-2471
Telephone 214-969-9099
Fax 214-953-0133

**CAULEY GELLER BOWMAN & RUDMAN, LLP**
Samuel H. Rudman
Russell J. Gunyan
200 Broadhollow Road
Suite 406
Melville, NY 11747
(631) 367-7100

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Three Bala Plaza East, Suite 500
Bala Cynwyd, PA 19004
(610) 667-7706

**Attorneys for Plaintiff**

42

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Jerry Ryan, (Plaintiff) declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the Complaint and retains Schiffrin & Barroway, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in the Flowserve Corporation (NYSE: FLS) security that is the subject of this action during the Class Period are as follows:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 200 | Bought | 6/10/02 | $31.52 |
| 200 | Sold | 6/12/02 | $31.00 |

List additional transactions on a separate sheet of paper, if necessary.

5.      During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws:  N/A

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of August, 2003.

JERRY RYAN