# EXHIBIT K

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| JERRY RYAN, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>FLOWSERVE CORPORATION, et al.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:03-CV-01769-B<br>**(Consolidated with 3:03-CV-01827-M; 3:03-CV-01846-M; 3:03-CV-02079-M)** |

**REBUTTAL REPORT OF BJORN I. STEINHOLT, CFA**

## I.    INTRODUCTION

1.      On March 16, 2006 I submitted an expert report addressing, among other things, the issues of market efficiency and loss causation, relating to Flowserve Corporation ("Flowserve" or the "Company") securities traded from February 6, 2001 through September 27, 2002 (the "Class Period"). I have now been asked by plaintiffs' counsel to review and discuss an expert report dated March 17, 2006 by Denise Neumann Martin (the "Martin Report") addressing some of these same issues.

2.      As explained in greater detail below, the analysis presented by Martin does not change any of my opinions stated in my March 16 Report. Specifically, Martin's analysis does not change my opinion that the market in which Flowserve common stock and options traded during the Class Period was impersonal, open, well developed, and efficient. Nor does the Martin Report change my opinion that the allegedly false and misleading statements caused economic damages to investors who purchased Flowserve common stock during the Class Period.

3.      Below is a discussion of the issues raised in the Martin Report relating to market efficiency and loss causation.

## II.    MARKET EFFICIENCY

4.      According to the Martin Report, Martin was asked to evaluate whether Flowserve's stock traded in an efficient market. (Martin Report, Section I) Martin concedes that the factors adopted by courts to assess market efficiency are the so-called *Cammer* factors.[1] (Martin Report, Section V) Despite this acknowledgement, Martin does not consider any of the *Cammer* factors, or any other factors used by any other court, to assess market efficiency. As discussed in my March 16

---

[1]      *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

- 1 -

Report, these factors provide strong evidence that the market in which Flowserve's common stock traded during the Class Period was efficient.

5.    Martin, while not specifically opining that the market for Flowserve's stock was inefficient, arrives at the conclusion that the "statistical evidence" she has examined (which does not include the *Cammer* factors) "does not support the assertion that Flowserve's stock traded in an efficient market." (Martin Report, Section V) Her erroneous conclusion is based on two flawed analyses, discussed below.

### *Flowserve's Stock Price Response to Earnings Announcements*

6.    An analysis of Flowserve's earnings announcements during the Class Period together with the corresponding price movements in the Company's stock price clearly shows that investors paid attention to the information disclosed, analyzed the information, traded on the information, resulting in the information quickly becoming reflected in the Company's stock price. In other words, Flowserve's stock price reaction following earnings announcements during the Class Period is consistent with my conclusion that the Company's stock traded in an efficient market.

7.    Martin's assertion that Flowserve's "stock price did not respond to earnings announcements" is simply wrong and based on a fatally flawed analysis. (Martin Report, Section II) For one thing, she fails to accurately identify all the new material information disclosed in the earnings releases she examines. Even worse, she consistently uses the wrong earnings data for the various earnings periods during the Class Period. On several occasions, she even analyzes the wrong price reaction, apparently not realizing that certain earnings announcements were made after the close of the market. These errors are fatal and render Martin's analysis meaningless. However, I have gone through the earnings announcements during the Class Period and confirmed that the resulting price reactions are consistent with my opinion that the market for Flowserve common stock was efficient. My review of the earnings announcements is summarized below.

- 2 -

February 6, 2001:

8.    On February 6, 2001, Flowserve announced its fourth quarter 2000 results.

Following the announcement, a February 7, 2001 Robert W. Baird analyst report stated:

Flowserve reported 4Q00 earnings of $0.50 per share vs. $0.23 in 4Q99, $0.02 below our consensus–matching estimate.

Furthermore, a February 6, 2001 Credit Suisse First Boston analyst report stated:

Perhaps some disappointment with $1.70-1.90 guidance range for 2001 (it's a big range and $1.90 has been consensus). Management is being very cautious, and as a result, we are lowering our 2001 EPS estimate to $1.80 from $1.90.

9.    Based on the above, the earnings miss and reduction in future guidance, one would expect that Flowserve's stock price would decline following the earnings announcement. Not surprisingly, Flowserve's stock price did decline. By the end of February 6, 2001, Flowserve's stock price had declined almost 8% from its previous close, a statistically significant price decline.[2] This is consistent with what one would expect in an efficient market.

10.    Martin's analysis, on the other hand, is just riddled with errors. (Martin Report, Exhibit 2) First, she claims that Flowserve reported its third quarter 2000 financial results on February 6, 2001. This is incorrect. Flowserve reported its fourth quarter 2000 results on February 6, 2001. Second, she claims that the earnings per share for the quarter reported on February 6, 2001 was 18 cents, compared to a consensus estimate also of 18 cents per share. This is incorrect. Flowserve reported earnings of 50 cents per share for the fourth quarter 2000 versus a consensus estimate of 52 cents per share, *i.e.*, there was a 2 cents earnings miss. Third, she claims that the abnormal return for the day was positive 8.72%, when it actually was negative. The positive abnormal return is likely due to her accidentally inverting the sign. Fourth, she completely ignores

---

[2]    For the purpose of this Report, all reference to statistical significance relates to price declines that are statistically significant at the 95% level, per my analysis in my March 16 Report, Exhibit F.

- 3 -

new material information, such as the reduction in guidance, which also would help explain the price reaction in Flowserve's stock. In any event, any analysis based on such erroneous data is meaningless.

April 24, 2001:

11.    On April 24, 2001, Flowserve announced its results for the first quarter 2001.

Following the earnings announcement, an April 24, 2001 Robert W. Baird analyst report stated:

FLS: RAISING RATING TO STRONG BUY ON HEALTHY INTEGRATION
PROGRESS

*    *    *

Flowserve reported 1Q01 earnings per share of $0.10, down from $0.27 a year ago, modestly ahead of our $0.09 estimate. The consensus earnings estimate was $0.10.

*    *    *

We have raised our rating to recognize the important incremental points below that bode especially well for the second half of 2001 and 2002.

Furthermore, an April 24, 2001 Credit Suisse First Boston analyst report stated:

1q01 EPS Before Integration Expenses of $0.10 is In-Line with Expectations; Delivering Cost Savings Ahead of Schedule.

*    *    *

This quarter's results were very much in line with our model. We are raising our 2001 EPS estimate to $1.85 from $1.80.

12.    Based on the above, the positive news about integration/cost savings and analysts increasing their ratings/estimates, one would expect that Flowserve's stock price would increase following the earnings announcement. Not surprisingly, Flowserve's stock price did increase. By the end of April 24, 2001, Flowserve's stock price had increased more than 7.5% from its previous close, a statistically significant price increase. This is consistent with what one would expect in an efficient market.

- 4 -

13.    Martin's analysis, on the other hand, is again flawed. (Martin Report, Exhibit 2)

First, she claims that Flowserve reported its fourth quarter 2001 financial results on April 24, 2001.

This is incorrect. Flowserve reported its first quarter 2001 results on April 24, 2001. Second, she

claims that the earnings per share for the quarter reported on April 24, 2001 was 50 cents, compared

to a consensus estimate of 52 cents per share. This is incorrect. Flowserve reported earnings of 10

cents per share for the first quarter 2001 versus a consensus estimate also of 10 cents per share.

Third, she claims that the abnormal return for the day was negative 7.086%, when it actually was

positive. The positive abnormal return is likely due to her accidentally inverting the sign. Fourth,

she completely ignores new material information, such as positive news about integration/cost

savings and analyst upgrades, which would help explain the price reaction in Flowserve's stock.

Again, any analysis based on such erroneous data is meaningless.

July 24, 2001:

14.    On July 24, 2001 Flowserve announced its second quarter 2002 results. Following

the announcement, a July 25, 2001 Robert W. Baird analyst report stated:

Flowserve reported 2Q01 EPS of $0.35 (before restructuring charge) versus $0.35
last year, in line with our consensus–matching estimate.

\*       \*       \*

Flowserve lowered its earnings guidance for the third quarter to $0.35-$0.40 and for
2001 to $1.45-$1.65 per share.

Furthermore, a July 24, 2001 Credit Suisse First Boston analyst report stated:

Flowserve's 2q01 EPS were in line with Street expectations at $0.35 before
integration expenses. The guidance provided for 2h01 was very disappointing,
however, especially since management has made "under-promise and over-deliver"
its mantra in dealing with the Street.

15.    Based on the above, specifically the reduction in future guidance, one would expect

that Flowserve's stock price would decline following the earnings announcement. Not surprisingly,

Flowserve's stock price did decline. By the end of July 24, 2001, Flowserve's stock price had

declined more than 10% from its previous close, a statistically significant price decline. This is consistent with what one would expect in an efficient market.

16.    Martin's analysis, on the other hand, again falls short. (Martin Report, Exhibit 2) First, she claims that the Flowserve reported its first quarter 2001 on July 24, 2001. This is incorrect. Flowserve reported its second quarter 2001 results on July 24, 2001. Second, she claims that the earnings per share for the quarter reported on July 24, 2001 was 10 cents, compared to a consensus estimate also of 10 cents per share. This is incorrect. Flowserve reported earnings of 35 cents per share for the second quarter 2001 versus a consensus estimate of 35 cents per share. Third, she claims that the abnormal return for the day was positive 10.019%, when it actually was negative. The positive abnormal return is likely due to her accidentally inverting the sign. Fourth, she completely ignores new material information, such as the reduction in guidance, which would help explain the price reaction in Flowserve's stock. Again, any analysis based on such erroneous data is meaningless.

October 22, 2001:

17.    On October 22, 2001 Flowserve announced its results for the third quarter 2001. Following the announcement, an October 23, 2001 Robert W. Baird analyst report stated:

Flowserve reported 3Q01 EPS of $0.38 (before restructuring change) versus $0.18 last year, $0.03 above the consensus estimate and one cent above our $0.37 estimate.

\*    \*    \*

We are pleased by the earnings and order performance this quarter and stress that 2002 looks exceptional relative to its industry peers.

Furthermore, an October 24, 2001, a Bear Stearns analyst report stated:

Management issued 2002 EPS guidance which was below Street expectations. This was due to concerns over the timing and mix of maintenance revenues.

\*    \*    \*

As we believe the stock has been hurt by concerns over these factors, we feel the risk has declined.

- 6 -

18.      While the October 22, 2001 earnings announcement contained both positive and negative information, the positive information would be expected to outweigh the negative to the extent the negative information (reduced guidance following the terrorist attack on 9/11) was already reflected in Flowserve's stock price. Not surprisingly, Flowserve's stock price increased. By the end of October 23, 2001, Flowserve's stock price had increased more than 6.5% from its previous close, a statistically significant price increase. This is consistent with what one would expect in an efficient market.

19.      Martin's analysis, on the other hand, is again is faulty. (Martin Report, Exhibit 2) First, she claims that the Flowserve reported its second quarter 2001 financial results on October 22, 2001. This is incorrect. Flowserve reported its third quarter 2001 results on October 22, 2001. Second, she claims that the earnings per share for the quarter reported on October 22, 2001 was 35 cents, compared to a consensus estimate also of 35 cents per share. This is incorrect. Flowserve reported earnings of 38 cents per share for the third quarter 2001 versus a consensus estimate of 35 cents per share, *i.e.*, the Company reported earnings per share that was 3 cents better than the consensus estimate. Third, she uses the abnormal return for October 22, 2001 even though the earnings announcement occurred after the market had closed on October 22, 2001. In other words, she should have used the abnormal return on October 23, 2001. Fourth, she fails to analyze all the new material information disclosed in the earnings release. Again, any analysis based on such erroneous data is meaningless.

February 4, 2002:

20.      On February 4, 2002, Flowserve announced its fourth quarter 2001 results. Following the announcement, a February 5, 2002 Bear Stearns analyst report stated:

> Flowserve reported 4Q01 EPS of $0.58 vs. $0.50 a year ago, up 17%. (Both periods exclude charges.) Our estimate was $0.57, while the Street's was $0.56. Results in the Pumps Division were below expectations, but those in Valves and Seals/Services were above. The variance to our forecast was in a non-operating item.

- 7 -

Furthermore, a February 5, 2002 Credit Suisse First Boston analyst report stated:

> The 4Q, 2001 result reflect a mix of issues that now appears to be behind the company.

*    *    *

> After digesting all of this information, our outlook essentially remains unchanged.

21.    Based on my review of the analyst commentary, the February 4, 2002 earnings announcement did not significantly change analysts' outlook for the Company. Not surprisingly, the stock price did not change significantly either. By the end of February 5, 2002, Flowserve's stock price increased less than 10 cents per share. This is consistent with what one would expect in an efficient market.

22.    Martin's analysis, on the other hand, again contains the wrong data. (Martin Report, Exhibit 2) First, she claims that the Flowserve reported its third quarter 2001 financial results on February 4, 2002. This is incorrect. Flowserve reported its fourth quarter 2001 results on February 4, 2002. Second, she claims that the earnings per share for the quarter reported on February 4, 2002, was 38 cents, compared to a consensus estimate of 35 cents per share. This is incorrect. Flowserve reported earnings of 58 cents per share for the fourth quarter 2001 versus a consensus estimate of 56 cents per share. Third, she uses the abnormal return for February 4, 2002 in her analysis, even though the earnings announcement occurred after the market had closed on February 4, 2002. In other words, she should have used the abnormal return on February 5, 2002. Fourth, she fails to analyze all the new material information disclosed in the earnings release. Again, any analysis based on such erroneous data is meaningless.

April 22, 2002:

23.    On April 22, 2002, Flowserve announced its first quarter 2002 results. Following the earnings announcement, an April 23, 2002 Bear Stearns analyst report stated:

- 8 -

Flowserve reported 1Q02 EPS of $0.28 versus $0.10 a year ago. 1Q02 EPS include approximately $0.09 of eliminated goodwill amortization under FAS 141/142. On a comparative basis, EPS increased 90%. This result was in line with management's EPS guidance of $0.26 to $0.29 issued two weeks ago, though was $0.01 below our forecast.

Furthermore, an April 23, 2002 Credit Suisse First Boston analyst report stated:

Flowserve reported a Q1 2002 profit of $0.28/diluted share versus $0.19 for Q1 2001 (adjusting for FASB 142 and excluding one-time items), in-line with CSFB and Street estimates.

24.     With Flowserve reporting in-line earnings, without any other major new material disclosures, one would expect that the stock price would not significantly change following the earnings announcement. Not surprisingly, the stock price did not change significantly. By the end of April 23, 2002, Flowserve's stock price decreased only 16 cents per share. This is consistent with what one would expect in an efficient market.

25.     Martin's analysis, on the other hand, again fails to use the correct data. (Martin Report, Exhibit 2) First, she claims that the Flowserve reported its fourth quarter 2001 financial results on April 22, 2002. This is incorrect. Flowserve reported its first quarter 2002 results on April 22, 2002. Second, she claims that the earnings per share for the quarter reported on April 22, 2002, was 58 cents, compared to a consensus estimate of 56 cents per share. This is incorrect. Flowserve reported earnings of 28 cents per share for the first quarter 2002 which was in line with Company guidance and Street consensus. Third, she uses the abnormal return for April 22, 2002 in her analysis, even though the earnings announcement occurred after the market had closed on April 22, 2002. In other words, she should have used the abnormal return on April 23, 2002. Fourth, she as usual fails to analyze all the new material information disclosed in the earnings release. Again, any analysis based on such erroneous data is meaningless.

- 9 -

July 22, 2002:

26.    On July 22, 2002 Flowserve announced its second quarter 2002 results. Following

the announcement, a July 23, 2002 Robert W. Baird analyst report stated:

Flowserve reported 2Q02 earnings of $0.46 per share (excluding charges) vs. $0.35
in the prior year, one cent below consensus and $0.03 below our estimate.

\*    \*    \*

Management issued 3Q02 guidance of $0.38-$0.43 per share versus consensus of
$0.55. Management lowered its guidance range for the full year from $1.90-$2.30 to
$1.70-$1.90 per share; our $2.11 estimate is under review (consensus had been
$2.12).

27.    Based on the above, the earnings shortfall combined with the substantially reduced

guidance, one would expect that Flowserve's stock price would decrease significantly following the

earnings announcement. Not surprisingly, Flowserve's stock price declined. By the end of July 23,

2002, Flowserve's stock price had decreased more than 37% from its previous close, a statistically

significant price increase. This is consistent with what one would expect in an efficient market.

28.    Martin's analysis, on the other hand, again is flawed. (Martin Report, Exhibit 2)

First, she claims that the Flowserve reported its first quarter 2002 financial results on July 22, 2002.

This is incorrect. Flowserve reported its second quarter 2002 results on July 22, 2002. Second, she

claims that the earnings per share for the quarter reported on July 22, 2002, was 28 cents, compared

to a consensus estimate of 30 cents per share. This is incorrect. Flowserve reported earnings of 46

cents per share for the second quarter 2002 versus a consensus estimate of 47 cents. Third, she uses

the abnormal return for July 22, 2002 in her analysis, even though the earnings announcement

occurred after the market had closed on July 22, 2002. In other words, she should have used the

abnormal return on July 23, 2002. Fourth, she fails to analyze all the new material information

disclosed in the earnings release. Again, any analysis based on such erroneous data is meaningless.

- 10 -

29.    Based on the above review, it is clear that investors paid attention to the information

disclosed in Flowserve's earnings announcements, analyzed the information, and traded on it

resulting in the information quickly becoming reflected in the Company's stock price. Furthermore,

in addition to her failure to actually analyze all of the new material information that was disclosed at

the time of the earnings announcements, Martin's Report is so riddled with data errors that her entire

analysis is meaningless.

### *Martin Trading Strategy*

30.    Martin also claims that an analysis she conducted on price declines greater than 5% is

inconsistent with my conclusion that the market for Flowserve stock was efficient during the Class

Period. Specifically, she states that "over the first two days following a negative price drop of 5% or

more, the stock tended to rebound, while over the two days following a positive reaction, the stock

tended to fall." (Martin Report, Section IV.B. 2.) Again, Martin does not examine the

contemporaneous information to determine whether the price movements were consistent with that

of an efficient market. Rather, she simply concludes that there seems to be a pattern, and that such a

pattern is inconsistent with an efficient market.

31.    The reality is, if one simply looks for patterns, one can generally find such patterns

even in a random set of numbers. This is called data mining. An article in the *Financial Analyst*

*Journal* on the subject explains data mining as follows:

> Data mining is the practice of finding forecasting models by searching through
> databases for correlations, patterns, or trading rules. After searching through enough
> variables or rules – say 100 – a researcher will find, simply by chance, about 5
> percent that are statistically significant at the 95 percent confidence level. Data
> mining becomes a particular problem when the researcher proclaims the final pattern
> significant without providing the number of unsuccessful mining attempts.[3]

---

[3]    Grant McQueen and Steven Thorley, "Mining Fool's Gold," *Financial Analyst Journal*,
May/April 1999.

32.    Martin proceeds to suggest that the "overreaction" she claims to have observed meant that "an investor who followed a trading rule of selling whenever a positive stock price movement was observed and buying whenever a negative stock price movement observed would have made money over this period." (Martin Report, Section IV.B.2.)  The issue here is whether the trading strategy identified by Martin represented a persistent arbitrage opportunity during the Class Period. In an efficient market, arbitrage opportunities will only exist for a short period of time as sophisticated investors exploiting such arbitrage opportunities will also, in the process, eliminate them. It is important to note that an arbitrage opportunity is not simply a trading strategy designed in hindsight. To test Martin's trading rule, I analyzed Flowserve's stock prices going back to 1997, just as Martin went back to 1997 to analyze price reactions to earnings announcements. Below is a table which shows the years when an investor would have made money using Martin's proposed trading rule, and the years they would have lost money. *See* Exhibit A attached hereto.

**Table 1: Test of Martin's Trading Rule**

|      | 5% Increase 1-day Period | 5% Increase 2-day Period | 5% Decrease 1-day Period | 5% Decrease 2-day Period |
|------|--------------------------|--------------------------|--------------------------|--------------------------|
| 1997 | Gain | Gain | Loss | Loss |
| 1998 | Gain | Gain | Loss | Loss |
| 1999 | Loss | Loss | Loss | Loss |
| 2000 | Loss | Loss | Loss | Loss |
| 2001 | Gain | Gain | Gain | Gain |
| 2002 | Loss | Gain | Gain | Gain |
| 2003 | Gain | Loss | Gain | Gain |
| 2004 | Loss | Loss | Gain | Gain |
| 2005 | Gain | Loss | n.a. | n.a. |

33.    Interestingly, during the years I examined, Martin's trading rule would have worked 17 out of 34 times tested, or exactly 50% of the time – the same likelihood as winning a coin flip. A trading rule that only works 50% of the time does not represent an arbitrage opportunity. Of course, one could change the trading rule and get different results. If one was to change the benchmark from 5% to some other number (3%, 4%, 6%, 7%, . . . ) the outcome would change, and Martin's trading

- 12 -

rule would sometimes work more and sometimes less than 50% of the time. The same is true if one changes the holding period from 1-2 days to some other holding period. The point is, Martin has constructed a trading rule that can only consistently provide profits in hindsight when one knows which years to use her trading rule and which years to avoid, rather than an arbitrage opportunity that investors could have taken advantage of at the time. As a result, her analysis fails to provide any evidence that the market for Flowserve's common stock was inefficient.

34.    Finally, Martin references analyst commentary following the Company's July 22, 2002 earnings announcement. She claims that this analyst commentary supports her assertion that Flowserve's stock overreacted when it declined more than 37% to close at $14.55 per share on July 23, 2002. The analyst commentary she cites is generally critical of the initial decline in Flowserve's stock price. However, differences of opinions among analysts and investors are not unusual. Analysts are often more optimistic about the companies they follow than investors. Furthermore, different analysts may also have different views amongst themselves about the companies they follow. That is why some analysts may have a "buy" rating at a time other analysts have a "hold" rating. Similarly, different investors often have different views about the companies they invest in. That is why some investors buy shares in a company at a time other investors sell. The key to market efficiency is whether the investors paid attention to new material information, analyzed this information and then traded on it so that it quickly would become reflected in the company's stock price. In this case, the evidence shows that investors did, and, as a result, it is my opinion that the market for Flowserve's common stock during the Class Period was efficient.

## *Market Efficiency Conclusion*

35.    Based on my review of the analyses submitted by Martin, I have concluded that neither of them provides any evidence that would change my opinion that Flowserve's common stock traded in an efficient market during the Class Period.

- 13 -

## III.    LOSS CAUSATION

36.    In her analysis of loss causation, Martin groups the allegations in this case into four different categories: a) false and misleading earnings guidance, b) false and misleading financial statements, c) violation of debt covenants, and d) integration problems. She then claims that on July 23, 2002 and September 27, 2002 (the days where most of Flowserve's price decline occurred at the end of the Class Period), the Company "did not disclose information inconsistent with Flowserve's prior statements related to at least three of the four categories of alleged misstatements: Flowserve's financial statements, problems with integration and potential violation of debt covenants." (Martin Report, Section II)

37.    All of the categories listed by Martin are related. According to plaintiffs' allegations, the integration problems relate, at least in part, to why the Company had to reduce guidance, regardless of whether the Company stated so at the time. The historical financial statements provided the foundation for the guidance, and, combined with the guidance, in large part, set investors' expectations regarding the Company's future performance. The historical financial statements were used to determine whether the Company was in compliance with debt covenants, while the guidance was used to assess whether the Company would continue to be in compliance with the debt covenants.

38.    As explained in my March 16 Report, artificially inflated expectations (as well as the price inflation) are, generally, reduced, either by: a) the company failing to meet the inflated expectations, or b) a specific disclosure of the falsehood or misleading nature of the information at issue. The first can take the form of a reduction in guidance, as it did in this case, and the latter can take the form of a restatement of previously reported financial results. While the July 22 and September 27 disclosures did not reveal that the earlier reported financial results were false, they did reduce the extent earlier financial results would be relied on and used by investors to forecast future

- 14 -

performance. The disclosures also revealed to investors that Flowserve could encounter problems complying with their debt covenants. In fact, this is specifically addressed in a Credit Suisse First Boston analyst report dated September 30, 2002. It stated:

Credit Concerns Significant Factor in Equity Market Reaction

While working capital, cash flow, cost reductions, and the other usual Flowserve topics were covered on the company's call on Friday, many questions focused on the company's potential to breach its debt covenants – specifically its leverage ratio covenant.

39.    Based on the above, as well as my more detailed discussion of this issue in my March 16 Report, it is my opinion that the price declines on July 22, 2002 and September 27, 2002 are related to the alleged fraud, that the disclosures reduced the artificial inflation in Flowserve's stock price caused by the alleged fraud, thereby effectively locking in investors' economic losses caused by the alleged fraud.

## VI.    CONCLUSION

40.    Based on the above, the issues raised in the Martin Report do not change my opinions that: a) Flowserve's common stock traded in an efficient market, and b) the allegedly false and misleading statements caused economic damages to investors who purchased Flowserve common stock during the Class Period.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 14th day of April, 2006, at San Diego, California.

Respectfully submitted,

BJORN I. STEINHOLT, CFA

- 15 -

# Exhibit A

APP124

# Flowserve Corporation

*Martin Trading Rule:*
Whenever 5% positive stock price movement observed, sell stock and buy back 1 or 2 days later
Whenever 5% negative stock price movement observed, buy stock and sell 1 or 2 days later

| | | | | Martin Trading Strategy when 5% Positive Price Movement Observed | | | | | Martin Trading Strategy when 5% Positive Price Movement Observed | | | | |
| | | | | | | t+1 | | t+2 | | | t+1 | | t+2 |
| Date | Volume | Price | % Change | Sell (t) | Buy (t+1) | Profit/(Loss) | Buy (t+2) | Profit/(Loss) | Buy (t) | Sell (t+1) | Profit/(Loss) | Sell (t+2) | Profit/(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/10/1997 | 401,000 | $23.81 | -9.29% | - | - | - | - | - | (23.81) | 22.63 | (1.19) | 24.00 | 0.19 |
| 2/12/1997 | 878,500 | $24.00 | 6.08% | 24.00 | (24.31) | (0.31) | (23.75) | 0.25 | - | - | - | - | - |
| 7/9/1997 | 179,800 | $30.63 | 5.15% | 30.63 | (30.56) | 0.06 | (32.25) | (1.63) | - | - | - | - | - |
| 7/11/1997 | 154,800 | $32.25 | 5.52% | 32.25 | (32.50) | (0.25) | (33.50) | (1.25) | - | - | - | - | - |
| 7/22/1997 | 360,200 | $35.50 | 5.58% | 35.50 | (34.50) | 1.00 | (33.50) | 2.00 | - | - | - | - | - |
| 9/19/1997 | 933,900 | $30.81 | -8.70% | - | - | - | - | - | (30.81) | 30.44 | (0.38) | 30.00 | (0.81) |
| 12/4/1997 | 126,900 | $29.25 | 5.64% | 29.25 | (29.31) | (0.06) | (29.50) | (0.25) | - | - | - | - | - |
| 8/27/1998 | 41,400 | $18.88 | -7.08% | - | - | - | - | - | (18.88) | 18.81 | (0.06) | 18.75 | (0.13) |
| 9/25/1998 | 66,700 | $19.88 | 5.30% | 19.88 | (19.31) | 0.56 | (19.81) | 0.06 | - | - | - | - | - |
| 10/1/1998 | 33,100 | $18.88 | -6.79% | - | - | - | - | - | (18.88) | 18.69 | (0.19) | 18.63 | (0.25) |
| 10/27/1998 | 142,300 | $18.19 | -6.73% | - | - | - | - | - | (18.19) | 17.81 | (0.38) | 17.88 | (0.31) |
| 4/14/1999 | 974,300 | $16.44 | 5.62% | 16.44 | (16.88) | (0.44) | (17.75) | (1.31) | - | - | - | - | - |
| 4/16/1999 | 242,600 | $17.75 | 5.19% | 17.75 | (19.13) | (1.38) | (19.25) | (1.50) | - | - | - | - | - |
| 4/19/1999 | 918,900 | $19.13 | 7.55% | 19.13 | (19.25) | (0.13) | (19.25) | (0.13) | - | - | - | - | - |
| 4/22/1999 | 92,900 | $18.19 | -5.52% | - | - | - | - | - | (18.19) | 17.88 | (0.31) | 18.13 | (0.06) |
| 5/3/1999 | 478,800 | $20.06 | 7.72% | 20.06 | (21.06) | (1.00) | (19.81) | 0.25 | - | - | - | - | - |
| 5/5/1999 | 94,400 | $19.81 | -5.93% | - | - | - | - | - | (19.81) | 20.13 | 0.31 | 20.25 | 0.44 |
| 6/28/1999 | 111,800 | $19.50 | -5.45% | - | - | - | - | - | (19.50) | 18.88 | (0.63) | 18.94 | (0.56) |
| 1/24/2000 | 88,700 | $15.38 | -5.02% | - | - | - | - | - | (15.38) | 15.56 | 0.19 | 15.56 | 0.19 |
| 2/10/2000 | 1,117,800 | $13.56 | -8.44% | - | - | - | - | - | (13.56) | 12.94 | (0.63) | 12.38 | (1.19) |
| 3/8/2000 | 139,700 | $11.19 | 5.92% | 11.19 | (11.56) | (0.38) | (11.38) | (0.19) | - | - | - | - | - |
| 3/17/2000 | 721,200 | $12.56 | 5.24% | 12.56 | (12.56) | - | (12.56) | - | - | - | - | - | - |
| 3/24/2000 | 968,900 | $13.56 | 6.90% | 13.56 | (13.13) | 0.44 | (12.75) | 0.81 | - | - | - | - | - |
| 4/24/2000 | 480,000 | $12.44 | -5.24% | - | - | - | - | - | (12.44) | 12.31 | (0.13) | 13.00 | 0.56 |
| 4/26/2000 | 1,375,200 | $13.00 | 5.58% | 13.00 | (14.13) | (1.13) | (14.13) | (1.13) | - | - | - | - | - |
| 4/27/2000 | 804,800 | $14.13 | 8.65% | 14.13 | (14.13) | - | (13.94) | 0.19 | - | - | - | - | - |
| 5/4/2000 | 722,500 | $16.13 | 10.26% | 16.13 | (16.25) | (0.13) | (15.94) | 0.19 | - | - | - | - | - |
| 6/2/2000 | 119,800 | $17.38 | 5.70% | 17.38 | (17.63) | (0.25) | (17.31) | 0.06 | - | - | - | - | - |
| 8/29/2000 | 196,600 | $18.31 | 5.02% | 18.31 | (18.50) | (0.19) | (18.13) | 0.19 | - | - | - | - | - |
| 10/24/2000 | 160,900 | $18.00 | 7.06% | 18.00 | (17.56) | 0.44 | (18.19) | (0.19) | - | - | - | - | - |
| 10/26/2000 | 94,500 | $18.50 | 5.34% | 18.50 | (18.44) | 0.06 | (19.00) | (0.50) | - | - | - | - | - |
| 10/31/2000 | 271,500 | $20.13 | 6.98% | 20.13 | (20.25) | (0.13) | (20.44) | (0.31) | - | - | - | - | - |
| 12/8/2000 | 172,900 | $20.75 | 5.40% | 20.75 | (21.50) | (0.75) | (21.63) | (0.88) | - | - | - | - | - |
| 12/13/2000 | 84,700 | $20.50 | -5.20% | - | - | - | - | - | (20.50) | 19.94 | (0.56) | 19.50 | (1.00) |
| 12/21/2000 | 132,900 | $19.31 | 5.46% | 19.31 | (20.81) | (1.50) | (21.06) | (1.75) | - | - | - | - | - |
| 12/22/2000 | 198,000 | $20.81 | 7.77% | 20.81 | (21.06) | (0.25) | (21.75) | (0.94) | - | - | - | - | - |
| 12/28/2000 | 185,800 | $23.00 | 5.75% | 23.00 | (21.38) | 1.63 | (20.63) | 2.38 | - | - | - | - | - |
| 12/29/2000 | 147,500 | $21.38 | -7.07% | - | - | - | - | - | (21.38) | 20.63 | (0.75) | 22.00 | 0.63 |
| 1/3/2001 | 159,700 | $22.00 | 6.67% | 22.00 | (21.75) | 0.25 | (20.44) | 1.56 | - | - | - | - | - |

Exhibit A

Page 1

**Flowserve Corporation**

*Martin Trading Rule:*

Whenever 5% positive stock price movement observed, sell stock and buy back 1 or 2 days later

Whenever 5% negative stock price movement observed, buy stock and sell 1 or 2 days later

| Date | Volume | Price | % Change | Martin Trading Strategy when 5% Positive Price Movement Observed | | | | | Martin Trading Strategy when 5% Positive Price Movement Observed | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | t+1 | | t+2 | | | t+1 | | t+2 |
| | | | | Sell (t) | Buy (t+1) | Profit/(Loss) | Buy (t+2) | Profit/(Loss) | Buy (t) | Sell (t+1) | Profit/(Loss) | Sell (t+2) | Profit/(Loss) |
| 1/5/2001 | 122,600 | $20.44 | -6.03% | - | - | - | - | - | (20.44) | 20.50 | 0.06 | 21.56 | 1.13 |
| 1/9/2001 | 80,200 | $21.56 | 5.18% | 21.56 | (21.50) | 0.06 | (21.19) | 0.38 | - | - | - | - | - |
| 2/6/2001 | 664,900 | $20.75 | -7.98% | - | - | - | - | - | (20.75) | 20.93 | 0.18 | 20.92 | 0.17 |
| 2/20/2001 | 255,100 | $22.75 | 5.37% | 22.75 | (22.20) | 0.55 | (22.22) | 0.53 | - | - | - | - | - |
| 3/16/2001 | 123,100 | $20.77 | -5.80% | - | - | - | - | - | (20.77) | 21.15 | 0.38 | 21.01 | 0.24 |
| 3/23/2001 | 189,600 | $21.01 | 5.58% | 21.01 | (20.64) | 0.37 | (21.55) | (0.54) | - | - | - | - | - |
| 3/28/2001 | 120,600 | $20.46 | -5.06% | - | - | - | - | - | (20.46) | 21.29 | 0.83 | 22.44 | 1.98 |
| 3/30/2001 | 256,800 | $22.44 | 5.49% | 22.44 | (21.50) | 0.94 | (21.03) | 1.41 | - | - | - | - | - |
| 4/19/2001 | 362,900 | $25.69 | 5.33% | 25.69 | (24.50) | 1.19 | (24.35) | 1.34 | - | - | - | - | - |
| 4/24/2001 | 405,300 | $26.22 | 7.68% | 26.22 | (27.40) | (1.18) | (27.95) | (1.73) | - | - | - | - | - |
| 6/5/2001 | 251,400 | $32.24 | 6.47% | 32.24 | (32.26) | (0.02) | (31.60) | 0.64 | - | - | - | - | - |
| 6/21/2001 | 397,600 | $32.60 | 5.16% | 32.60 | (31.87) | 0.73 | (30.10) | 2.50 | - | - | - | - | - |
| 6/25/2001 | 189,900 | $30.10 | -5.55% | - | - | - | - | - | (30.10) | 31.04 | 0.94 | 30.89 | 0.79 |
| 7/10/2001 | 500,100 | $27.38 | -7.25% | - | - | - | - | - | (27.38) | 27.98 | 0.60 | 28.15 | 0.77 |
| 7/24/2001 | 2,082,100 | $23.24 | -10.79% | - | - | - | - | - | (23.24) | 25.02 | 1.78 | 24.74 | 1.50 |
| 7/25/2001 | 497,200 | $25.02 | 7.66% | 25.02 | (24.74) | 0.28 | (25.00) | 0.02 | - | - | - | - | - |
| 9/19/2001 | 113,800 | $22.12 | -5.83% | - | - | - | - | - | (22.12) | 20.76 | (1.36) | 19.33 | (2.79) |
| 9/20/2001 | 144,900 | $20.76 | -6.15% | - | - | - | - | - | (20.76) | 19.33 | (1.43) | 21.34 | 0.58 |
| 9/21/2001 | 274,400 | $19.33 | -6.89% | - | - | - | - | - | (19.33) | 21.34 | 2.01 | 20.44 | 1.11 |
| 9/24/2001 | 213,100 | $21.34 | 10.40% | 21.34 | (20.44) | 0.90 | (19.79) | 1.55 | - | - | - | - | - |
| 10/23/2001 | 827,800 | $21.84 | 6.80% | 21.84 | (23.00) | (1.16) | (22.88) | (1.04) | - | - | - | - | - |
| 10/24/2001 | 239,400 | $23.00 | 5.31% | 23.00 | (22.88) | 0.12 | (24.15) | (1.15) | - | - | - | - | - |
| 10/26/2001 | 161,600 | $24.15 | 5.55% | 24.15 | (23.49) | 0.66 | (22.40) | 1.75 | - | - | - | - | - |
| 11/5/2001 | 272,800 | $23.55 | -5.42% | - | - | - | - | - | (23.55) | 24.00 | 0.45 | 23.39 | (0.16) |
| 2/8/2002 | 170,000 | $24.48 | 5.25% | 24.48 | (25.36) | (0.88) | (25.00) | (0.52) | - | - | - | - | - |
| 2/13/2002 | 279,800 | $26.50 | 6.00% | 26.50 | (26.74) | (0.24) | (26.03) | 0.47 | - | - | - | - | - |
| 3/4/2002 | 344,500 | $29.82 | 5.37% | 29.82 | (29.72) | 0.10 | (29.60) | 0.22 | - | - | - | - | - |
| 4/4/2002 | 822,100 | $30.04 | -6.55% | - | - | - | - | - | (30.04) | 30.54 | 0.50 | 30.95 | 0.91 |
| 5/14/2002 | 607,600 | $34.79 | 5.36% | 34.79 | (34.17) | 0.62 | (33.41) | 1.38 | - | - | - | - | - |
| 7/1/2002 | 1,021,500 | $28.15 | -5.54% | - | - | - | - | - | (28.15) | 27.57 | (0.58) | 27.13 | (1.02) |
| 7/16/2002 | 1,152,300 | $24.90 | -6.46% | - | - | - | - | - | (24.90) | 24.84 | (0.06) | 24.70 | (0.20) |
| 7/23/2002 | 7,491,300 | $14.55 | -37.39% | - | - | - | - | - | (14.55) | 17.20 | 2.65 | 17.15 | 2.60 |
| 7/24/2002 | 2,928,500 | $17.20 | 18.21% | 17.20 | (17.15) | 0.05 | (16.61) | 0.59 | - | - | - | - | - |
| 7/29/2002 | 1,127,800 | $17.75 | 6.86% | 17.75 | (17.70) | 0.05 | (17.25) | 0.50 | - | - | - | - | - |
| 8/6/2002 | 690,800 | $16.85 | 6.11% | 16.85 | (16.87) | (0.02) | (17.22) | (0.37) | - | - | - | - | - |
| 9/3/2002 | 467,900 | $17.31 | -5.56% | - | - | - | - | - | (17.31) | 17.75 | 0.44 | 17.40 | 0.09 |
| 9/18/2002 | 1,279,300 | $15.69 | -6.33% | - | - | - | - | - | (15.69) | 15.07 | (0.62) | 14.78 | (0.91) |
| 9/27/2002 | 5,777,400 | $8.70 | -38.39% | - | - | - | - | - | (8.70) | 10.00 | 1.30 | 10.17 | 1.47 |
| 9/30/2002 | 1,705,800 | $10.00 | 14.94% | 10.00 | (10.17) | (0.17) | (9.35) | 0.65 | - | - | - | - | - |

Exhibit A

# Flowserve Corporation

*Matria Trading Rule:*

Whenever 5% positive stock price movement observed, sell stock and buy back 1 or 2 days later

Whenever 5% negative stock price movement observed, buy stock and sell 1 or 2 days later

| Date | Volume | Price | % Change | Matria Trading Strategy when 5% Positive Price Movement Observed | | | | | Matria Trading Strategy when 5% Positive Price Movement Observed | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | t+1 | | t+2 | | | t+1 | | t+2 |
| | | | | Sell (t) | Buy (t+1) | Profit/(Loss) | Buy (t+2) | Profit/(Loss) | Buy (t) | Sell (t+1) | Profit/(Loss) | Sell (t+2) | Profit/(Loss) |
| 10/2/2002 | 1,156,400 | $9.35 | -8.06% | - | - | - | - | - | (9.35) | 8.88 | (0.47) | 8.17 | (1.18) |
| 10/3/2002 | 1,276,400 | $8.88 | -5.03% | - | - | - | - | - | (8.88) | 8.17 | (0.71) | 8.70 | (0.18) |
| 10/4/2002 | 670,700 | $8.17 | -8.00% | - | - | - | - | - | (8.17) | 8.70 | 0.53 | 8.65 | 0.48 |
| 10/7/2002 | 905,800 | $8.70 | 6.49% | 8.70 | (8.65) | 0.05 | (8.07) | 0.63 | - | - | - | - | - |
| 10/9/2002 | 533,400 | $8.07 | -6.71% | - | - | - | - | - | (8.07) | 7.90 | (0.17) | 8.40 | 0.33 |
| 10/11/2002 | 837,400 | $8.40 | 6.33% | 8.40 | (8.34) | 0.06 | (9.65) | (1.25) | - | - | - | - | - |
| 10/15/2002 | 738,300 | $9.65 | 15.71% | 9.65 | (8.95) | 0.70 | (9.56) | 0.09 | - | - | - | - | - |
| 10/16/2002 | 490,300 | $8.95 | -7.25% | - | - | - | - | - | (8.95) | 9.56 | 0.61 | 9.54 | 0.59 |
| 10/17/2002 | 488,700 | $9.56 | 6.82% | 9.56 | (9.54) | 0.02 | (10.70) | (1.14) | - | - | - | - | - |
| 10/21/2002 | 841,300 | $10.70 | 12.16% | 10.70 | (12.17) | (1.47) | (11.15) | (0.45) | - | - | - | - | - |
| 10/22/2002 | 1,570,800 | $12.17 | 13.74% | 12.17 | (11.15) | 1.02 | (11.15) | 1.02 | - | - | - | - | - |
| 10/23/2002 | 1,231,100 | $11.15 | -8.38% | - | - | - | - | - | (11.15) | 11.15 | - | 11.90 | 0.75 |
| 10/25/2002 | 428,400 | $11.90 | 6.73% | 11.90 | (11.87) | 0.03 | (11.47) | 0.43 | - | - | - | - | - |
| 11/1/2002 | 472,100 | $12.36 | 5.46% | 12.36 | (12.90) | (0.54) | (12.92) | (0.56) | - | - | - | - | - |
| 11/21/2002 | 658,300 | $14.30 | 5.46% | 14.30 | (14.30) | - | (14.47) | (0.17) | - | - | - | - | - |
| 11/27/2002 | 320,200 | $15.39 | 5.77% | 15.39 | (15.22) | 0.17 | (15.24) | 0.15 | - | - | - | - | - |
| 1/17/2003 | 676,800 | $13.71 | -6.80% | - | - | - | - | - | (13.71) | 13.56 | (0.15) | 12.57 | (1.14) |
| 1/22/2003 | 438,000 | $12.57 | -7.30% | - | - | - | - | - | (12.57) | 12.57 | - | 12.40 | (0.17) |
| 2/7/2003 | 472,600 | $11.58 | -5.31% | - | - | - | - | - | (11.58) | 11.78 | 0.20 | 11.60 | 0.02 |
| 3/4/2003 | 341,200 | $11.10 | -5.45% | - | - | - | - | - | (11.10) | 10.70 | (0.40) | 11.06 | (0.04) |
| 3/17/2003 | 289,700 | $11.95 | 10.44% | 11.95 | (11.67) | 0.28 | (12.34) | (0.39) | - | - | - | - | - |
| 3/19/2003 | 314,700 | $12.34 | 5.74% | 12.34 | (12.30) | 0.04 | (13.02) | (0.68) | - | - | - | - | - |
| 3/21/2003 | 233,800 | $13.02 | 5.85% | 13.02 | (11.94) | 1.08 | (12.20) | 0.82 | - | - | - | - | - |
| 3/24/2003 | 543,800 | $11.94 | -8.29% | - | - | - | - | - | (11.94) | 12.20 | 0.26 | 11.93 | (0.01) |
| 4/2/2003 | 384,900 | $12.00 | 6.76% | 12.00 | (11.97) | 0.03 | (11.75) | 0.25 | - | - | - | - | - |
| 4/21/2003 | 572,800 | $14.29 | 5.85% | 14.29 | (14.38) | (0.09) | (14.46) | (0.17) | - | - | - | - | - |
| 5/19/2003 | 461,600 | $16.76 | -5.04% | - | - | - | - | - | (16.76) | 17.02 | 0.26 | 16.94 | 0.18 |
| 7/21/2003 | 1,481,800 | $17.10 | -10.84% | - | - | - | - | - | (17.10) | 18.26 | 1.16 | 19.03 | 1.93 |
| 7/22/2003 | 1,013,700 | $18.26 | 6.78% | 18.26 | (19.03) | (0.77) | (18.75) | (0.49) | - | - | - | - | - |
| 8/19/2003 | 700,100 | $20.87 | 6.48% | 20.87 | (20.96) | (0.09) | (20.95) | (0.08) | - | - | - | - | - |
| 10/21/2003 | 1,110,700 | $19.46 | -9.91% | - | - | - | - | - | (19.46) | 19.50 | 0.04 | 19.32 | (0.14) |
| 11/10/2003 | 424,300 | $20.29 | -5.58% | - | - | - | - | - | (20.29) | 20.20 | (0.09) | 20.90 | 0.61 |
| 12/1/2003 | 597,500 | $22.45 | 5.50% | 22.45 | (22.22) | 0.23 | (22.18) | 0.27 | - | - | - | - | - |
| 12/23/2003 | 1,215,300 | $20.77 | -6.74% | - | - | - | - | - | (20.77) | 20.95 | 0.18 | 20.78 | 0.01 |
| 1/28/2004 | 824,400 | $18.89 | -7.72% | - | - | - | - | - | (18.89) | 19.20 | 0.31 | 19.25 | 0.36 |
| 7/29/2004 | 1,026,200 | $23.90 | 9.48% | 23.90 | (23.95) | (0.05) | (24.05) | (0.15) | - | - | - | - | - |
| 10/27/2004 | 1,577,900 | $21.05 | -11.55% | - | - | - | - | - | (21.05) | 21.78 | 0.73 | 21.58 | 0.53 |
| 11/7/2005 | 912,700 | $37.25 | 6.98% | 37.25 | (36.51) | 0.74 | (37.49) | (0.24) | - | - | - | - | - |

Exhibit A

Page 3

APP127

**Flowserve Corporation**

*Martin Trading Rule:*

Whenever 5% positive stock price movement observed, sell stock and buy back 1 or 2 days later

Whenever 5% negative stock price movement observed, buy stock and sell 1 or 2 days later

| Date | Volume | Price | % Change | | Martin Trading Strategy when 5% Positive Price Movement Observed | | | | | | Martin Trading Strategy when 5% Positive Price Movement Observed | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | t+1 | | t+2 | | | | t+1 | | t+2 | |
| | | | | | Sell (t) | Buy (t+1) | Profit(Loss) | Buy (t+2) | Profit(Loss) | | Buy (t) | Sell (t+1) | Profit(Loss) | Sell (t+2) | Profit(Loss) |

**SUMMARY**

| Year | Sell (t) | Buy (t+1) | Profit(Loss) | Buy (t+2) | Profit(Loss) | Buy (t) | Sell (t+1) | Profit(Loss) | Sell (t+2) | Profit(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1997 | 151.63 | (151.19) | Gain | (151.25) | Gain | (54.63) | 53.06 | Loss | 54.00 | Loss |
| 1998 | 19.88 | (19.31) | Gain | (19.81) | Gain | (55.94) | 55.31 | Loss | 55.25 | Loss |
| 1999 | 73.38 | (76.31) | Loss | (76.06) | Loss | (57.50) | 56.88 | Loss | 57.31 | Loss |
| 2000 | 256.75 | (258.88) | Loss | (258.38) | Loss | (83.25) | 81.38 | Loss | 82.44 | Gain |
| 2001 | 341.86 | (338.17) | Gain | (334.65) | Gain | (248.90) | 253.34 | Gain | 254.21 | Gain |
| 2002 | 290.52 | (290.97) | Loss | (288.85) | Gain | (193.91) | 197.33 | Gain | 197.64 | Gain |
| 2003 | 125.18 | (124.47) | Gain | (125.65) | Loss | (155.28) | 156.74 | Gain | 156.53 | Gain |
| 2004 | 23.90 | (23.95) | Loss | (24.05) | Loss | (39.94) | 40.98 | Gain | 40.83 | Gain |
| 2005 | 37.25 | (36.51) | Gain | (37.49) | Loss | n.a. | n.a. | n.a. | n.a. | n.a. |

Page 4

Exhibit A

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Kimberly Epstein
KIMBERLY EPSTEIN

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail:KimCor@lerachlaw.com

**3:03-cv-01769** Ryan v. Flowserve Corporation et al
Jane J Boyle, presiding
**Date filed:** 08/07/2003 **Date of last filing:** 04/13/2006

# Attorneys

**Rodney Acker**
Jenkens & Gilchrist
Fountain Place
1445 Ross Ave
Suite 3200
Dallas, TX 75202-2799          representing     **Banc of America Securities LLC**
214/855-4500                                    *(Defendant)*
214/969-7136 FAX (fax)
racker@jenkens.com
  *Assigned: 08/09/2004*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*


                                                   **Credit Suisse First Boston LLC**
                                                   *(Defendant)*

**R Thaddeus Behrens**
Haynes & Boone
901 Main St
Suite 3100
Dallas, TX 75202-3789          representing     **Flowserve Corporation**
214/651-5000                                    *(Defendant)*
behrenst@haynesboone.com
  *Assigned: 06/17/2004*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*


**Thomas E Bilek**
Hoeffner & Bilek
1000 Louisiana St
Suite 1302
Houston, TX 77002              representing     **Harold Klagsbald**
713/227-7720                                    *(Consol Plaintiff)*
713/227-9404 FAX (fax)
tbilek@hb-legal.com
  *Assigned: 09/26/2003*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

APP130

**Mary K Blasy**
Lerach Coughlin Stoia Geller Rudman &
Robbins- San Francisco
100 Pine St
Suite 2600                          representing    **Alaska Electrical Pension Fund**
San Francisco, CA 94111                             *(Plaintiff)*
415/288-4545
415/288-4534 (fax)
mblasy@lerachlaw.com
  *Assigned: 03/24/2006*


**Willie Briscoe**
Provost Umphrey Law Firm - Dallas
3232 McKinney Ave
Suite 700
Dallas, TX 75204                    representing    **Alaska Electrical Pension Fund**
214/744-3000                                        *(Plaintiff)*
Provost_Dallas@yahoo.com
  *Assigned: 02/09/2004*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*


**Tamara J Driscoll**
Lerach Coughlin Stoia Geller Rudman &
Robbins - Seattle
1700 Seventh Ave
Suite 2260                          representing    **Alaska Electrical Pension Fund**
Seattle, WA 98101                                   *(Plaintiff)*
206/749-5544
tdriscoll@lerachlaw.com
  *Assigned: 05/23/2005*
  *ATTORNEY TO BE NOTICED*


                                                    **Massachusetts State Carpenters
                                                    Pension Fund**
                                                    *(Plaintiff)*


                                                    **Pipefitters, Locals 522 & 633 Pension
                                                    Trust Fund**

                                                    c/o Lerach Coughlin Stoia Geller
                                                    Rudman & Robbins LLP
                                                    100 Pine Street, Suite 2600
                                                    San Francisco, CA 94111
                                                    US
                                                    415-288-4545
                                                                    APP131

415-288-4534 (fax)
*(Plaintiff)*

**Kimberly C Epstein**
Lerach Coughlin Stoia Geller Rudman &
Robbins- San Francisco
100 Pine St
Suite 2600
San Francisco, CA 94111                    representing
415/288-4545
kimcor@lerachlaw.com
 *Assigned: 12/22/2003*
 *ATTORNEY TO BE NOTICED*

**Alaska Electrical Pension Fund**
*(Plaintiff)*

**Massachusetts State Carpenters
Pension Fund**
*(Plaintiff)*

**Pipefitters, Locals 522 & 633 Pension
Trust Fund**

c/o Lerach Coughlin Stoia Geller
Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111
US
415-288-4545
415-288-4534 (fax)
*(Plaintiff)*

**Jerry Ryan**
*(Plaintiff)*

**William B Federman**
Federman & Sherwood - Oklahoma City
120 N Robinson
Suite 2720
Oklahoma City, OK 73102
405/235-1560                               representing
405/239-2112 FAX (fax)
wfederman@aol.com
 *Assigned: 10/07/2003*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*

**Thomas Butterworth**
*(Consol Plaintiff)*

APP132

**Charles Watts Flynn**
Locke Liddell & Sapp
Chase Tower
2200 Ross Ave
Suite 2200
Dallas, TX 75201-6776                    representing    **Renee J Hornbaker**
214/740-8000                                             *(Defendant)*
214/740-8800 FAX (fax)
cwflynn@lockeliddell.com
  *Assigned: 08/10/2004*
  *ATTORNEY TO BE NOTICED*

**Robert J Hill**
Claxton & Hill
3131 McKinney Ave
Suite 700 LB 103
Dallas, TX 75204-2471
214/969-9029                             representing    **Jerry Ryan**
214/953-0583 FAX (fax)                                   *(Plaintiff)*
claxtonhill@airmail.net
  *Assigned: 08/07/2003*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

                                                         **Joseph Verga**
                                                         *(Movant)*

**Carrie Lee Huff**
Haynes & Boone - Dallas
901 Main St
Suite 3100
Dallas, TX 75202-3789                    representing    **Flowserve Corporation**
214/651-5009                                             *(Defendant)*
214/651-5940 FAX (fax)
huffc@haynesboone.com
  *Assigned: 08/05/2004*
  *ATTORNEY TO BE NOTICED*

**Joe Kendall**
Provost Umphrey Law Firm - Dallas
3232 McKinney Ave
Suite 700                                representing    **Alaska Electrical Pension Fund**
Dallas, TX 75204                                         *(Plaintiff)*
214/744-3000
214/744-3015 FAX (fax)
Provost_Dallas@yahoo.com
                                                         APP133

*Assigned: 10/06/2003*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dean J Kitchens**
Gibson Dunn & Crutcher - Los Angeles
333 South Grand Ave
Los Angeles, CA 90071-3197      representing      **PricewaterhouseCoopers LLP**
213/229-7000                                      *(Defendant)*
 *Assigned: 02/22/2006*
 *ATTORNEY TO BE NOTICED*

**David W Klaudt**
Locke Liddell & Sapp
Chase Tower
2200 Ross Ave
Suite 2200
Dallas, TX 75201-6776
214/740-8000                    representing      **Renee J Hornbaker**
214/756-8792 FAX (fax)                            *(Defendant)*
dklaudt@lockeliddell.com
 *Assigned: 06/17/2004*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*

**Mel E Lifshitz**
Bernstein Liebhart & Lifshitz
10 East 40th Street
New York, NY 10016              representing      **Harold Klagsbald**
212/779-1414                                      *(Consol Plaintiff)*
 *Assigned: 09/26/2003*

**Roger L Mandel**
Stanley Mandel & Iola
3100 Monticello Ave
Suite 750
Dallas, TX 75205               representing      **Robert K Finnell**
214/443-4302                                      *(Consol Plaintiff)*
rmandel@smi-law.com
 *Assigned: 10/07/2003*
 *ATTORNEY TO BE NOTICED*

**Jennifer E Morris**
Carrington Coleman Sloman & Blumenthal    representing      **C Scott Greer**
200 Crescent Court                                          *(Defendant)*

APP134

Suite 1500
Dallas, TX 75201
214/855-3044
214/855-1333 FAX (fax)
jmorris@ccsb.com
  *Assigned: 01/17/2006*
  *ATTORNEY TO BE NOTICED*

**Maria V Morris**
Lerach Coughlin Stoia Geller Rudman &
Robbins- San Francisco
100 Pine St
Suite 2600
San Francisco, CA 94111
415/288-4545
  *Assigned: 08/09/2005*

representing

**Alaska Electrical Pension Fund**
*(Plaintiff)*

**Todd A Murray**
Carrington Coleman Sloman & Blumenthal
- Dallas
200 Crescent Court
Suite 1500
Dallas, TX 75201
214/855-3107
tmurray@ccsb.com
  *Assigned: 08/09/2004*
  *ATTORNEY TO BE NOTICED*

representing

**C Scott Greer**
*(Defendant)*

**Willow E Radcliffe**
Lerach Coughlin Stoia Geller Rudman &
Robbins- San Francisco
100 Pine St
Suite 2600
San Francisco, CA 94111
415/288-4545
415/288-4534 (fax)
willowr@lerachlaw.com
  *Assigned: 02/22/2006*

representing

**Alaska Electrical Pension Fund**
*(Plaintiff)*

**Richard A Rohan**
Carrington Coleman Sloman & Blumenthal
- Dallas
200 Crescent Court
Suite 1500
Dallas, TX 75201
214/855-3000

representing

**C Scott Greer**
*(Defendant)*

APP135

rrohan@ccsb.com
*Assigned: 06/17/2004*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shana E Scarlett**
Lerach Coughlin Stoia Geller Rudman &
Robbins- San Francisco
100 Pine St
Suite 2600
San Francisco, CA 94111     representing     **Alaska Electrical Pension Fund**
415/288-4545                                 *(Plaintiff)*
shanas@lerachlaw.com
*Assigned: 12/22/2003*
*ATTORNEY TO BE NOTICED*

**Ellen B Sessions**
Jenkens & Gilchrist - Dallas
1445 Ross Ave
Suite 3700
Dallas, TX 75202-2799
214/855-4500     representing     **Banc of America Securities LLC**
214/855-4300 FAX (fax)              *(Defendant)*
esessions@jenkens.com
*Assigned: 06/17/2004*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                   **Credit Suisse First Boston**
                                   *TERMINATED: 06/29/2004*
                                   *(Defendant)*

**Jon G Shepherd**
Gibson Dunn & Crutcher
2100 McKinney
Suite 1100
Dallas, TX 75201
214/698-3100     representing     **PricewaterhouseCoopers LLP**
214/698-3400 FAX (fax)              *(Defendant)*
jshepherd@gibsondunn.com
*Assigned: 08/10/2004*
*TERMINATED: 02/08/2006*

**Marc R Stanley**                 representing     **Robert K Finnell**
Stanley Mandel & Iola                              *(Consol Plaintiff)*

APP136

3100 Monticello Ave
Suite 750
Dallas, TX 75205
214/443-4301
214/443-0358 FAX (fax)
mstanley@smi-law.com
  *Assigned: 10/07/2003*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

                                            **Robert K Finnell**
                                            *(Movant)*

**Melissa J Swindle**
Jenkens & Gilchrist - Dallas
1445 Ross Ave
Suite 3700
Dallas, TX 75202-2799            representing    **Banc of America Securities LLC**
214/855-4476                                     *(Defendant)*
mswindle@jenkens.com
  *Assigned: 03/31/2005*
  *ATTORNEY TO BE NOTICED*

                                            **Credit Suisse First Boston LLC**
                                            *(Defendant)*

**M Byron Wilder**
Gibson Dunn & Crutcher - Dallas
2100 McKinney Ave
Suite 1100
Dallas, TX 75201                                 **PricewaterhouseCoopers LLP**
214/698-3231                     representing    *(Defendant)*
214/698-3400 FAX (fax)
bwilder@gibsondunn.com
  *Assigned: 02/07/2006*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

**Shawn A Williams**
Lerach Coughlin Stoia Geller Rudman &
Robbins- San Francisco                           **Alaska Electrical Pension Fund**
100 Pine St                      representing    *(Plaintiff)*
Suite 2600
San Francisco, CA 94111
415/288-4545

APP137

415/288-4534 (fax)
shawnw@lerachlaw.com
*Assigned: 12/22/2003*

**Martin Woodward**
Stanley Mandel & Iola
3100 Monticello Ave
Suite 750
Dallas, TX 75205                    representing        **Robert K Finnell**
214/443-4304                                            *(Consol Plaintiff)*
mwoodward@smi-law.com
*Assigned: 10/07/2003*
*ATTORNEY TO BE NOTICED*

**Fletcher Yarbrough**
Carrington Coleman Sloman & Blumenthal
200 Crescent Court
Suite 1500
Dallas, TX 75201                    representing        **C Scott Greer**
214/855-3000                                            *(Defendant)*
214/855-1333 FAX (fax)
fyarbrough@ccsb.com
*Assigned: 08/10/2004*
*ATTORNEY TO BE NOTICED*

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/14/2006 14:45:32 | | |
| **PACER Login:** | mw0078 | **Client Code:** | |
| **Description:** | Attorney List | **Search Criteria:** | 3:03-cv-01769 |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

APP138

EXHIBIT L

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| JERRY RYAN, On Behalf of Himself and All Others Similarly Situated, | § § § | Civil Action No. 3:03-CV-01769-B **(Consolidated with 3:03-CV-01827-M; 3:03-CV-01846-M; 3:03-CV-02079-M)** |
| Plaintiff, | § § | |
| vs. | § § | |
| FLOWSERVE CORPORATION, et al., | § § | |
| Defendants. | § § § | |

**SECOND REBUTTAL REPORT OF BJORN I. STEINHOLT, CFA**

## I.    INTRODUCTION

1.    On March 16, 2006, I submitted an expert report addressing, among other things, the issues of market efficiency and loss causation relating to Flowserve Corporation ("Flowserve" or the "Company") securities traded from February 6, 2001 through September 27, 2002 (the "Class Period"). On April 14, 2006, I submitted a rebuttal to a report by defendants' expert Denise Neumann Martin ("Original Martin Report") dated March 17, 2006, demonstrating numerous fatal flaws in her analyses. I have now been asked by plaintiffs' counsel to review and discuss Martin's April 14, 2006 report ("Martin Rebuttal Report"), which attempts to rebut the opinions in my original report.

2.    For the reasons explained in greater detail below, the Martin Rebuttal Report does not change my opinion that the market in which Flowserve common stock and options traded during the Class Period was impersonal, open, well developed, and efficient. Nor does the Martin Rebuttal Report change my opinion that the allegedly false and misleading statements caused economic damages to investors who purchased Flowserve common stock during the Class Period.

## II.    MARKET EFFICIENCY

3.    Martin never opines that the market for Flowserve's common stock during the Class Period was inefficient. This supports my opinion that such a conclusion would be erroneous. Nor does Martin dispute that seven of the eight factors I analyzed strongly support my opinion that Flowserve's common stock traded in an efficient market. Specifically, Martin does not dispute that Flowserve's common stock was actively traded during the Class Period, that the Company was followed by numerous analysts who issued research reports throughout, and that a substantial portion of its shares were owned by large sophisticated institutions. These are key factors that economic experts, as well as courts, consider when analyzing the issue of market efficiency. The seven factors

- 1 -

that were ignored by Martin all provide strong evidence that the market for Flowserve's common stock during the Class Period was efficient.

4.      It is worth noting that Martin does partially correct some of the errors in her original report (Martin Rebuttal Report, Exhibit 2 and Exhibit 3); however, she fails to acknowledge that these partial corrections also alter some of her erroneous conclusions. Specifically, in the Original Martin Report, she claims that Flowserve's "stock price did not respond to earnings announcements." (Original Martin Report, Section II) As I noted in my rebuttal report, this is simply wrong and based on a fatally flawed analysis. Among other things, Martin often analyzed the wrong dates.

5.      The Martin Rebuttal Report, Exhibit 2, now shows five significant price reactions to the seven earnings announcements during the Class Period, consistent with the analysis in my previous rebuttal report. More importantly, Martin's new analysis in the revised Exhibit 3 demonstrates a positive relationship between positive earnings announcements and positive price reactions. In her original report, Martin erroneously claimed that prices sometimes moved in "the opposite direction" of what would be expected based on the earnings data. (Original Martin Report, Section V. A) This error resulted from Martin's presumably inadvertent reversal of the sign of the stock price movements (changing increases to decreases and *vice versa*), as noted in my previous rebuttal report. But while Martin partially corrects her exhibits, she neither addresses these changes in her report nor admits the unreliability of previous opinions.

6.      As mentioned above, the Martin Rebuttal Report only takes issue with one of the factors I examined, *Cammer* factor number five. This *Cammer* factor relates to whether Flowserve's stock price reacted quickly to new material information when such information was disclosed during the Class Period. Specifically, the *Cammer* court stated:

Finally, it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected

- 2 -

corporate events or financial releases and an immediate response in the stock price. This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory.[1]

7.      Following the guidance provided by the *Cammer* court, I performed an event analysis of the price reaction of Flowserve's common stock to the new, material information disclosed on July 22, 2002 and September 27, 2002 in my initial report. In both cases, the price reaction was quick and highly statistically significant at the 99% level of confidence. In my rebuttal report, I performed several additional event analyses, assessing the price reaction of Flowserve's common stock following each of the Company's earnings announcements during the Class Period. I performed this second set of analyses primarily to debunk Martin's claim that Flowserve's stock either did not react to or reacted in "the opposite direction" of such earnings announcements. My analysis of the seven earnings announcements during the Class Period showed that:

a)      three of these earnings announcements provided the market with new, materially negative information that was followed by a statistically significant price decline in Flowserve's stock;

b)      two of these earnings announcements provided the market with new, materially positive information that was followed by a statistically significant price increase in Flowserve's stock; and

c)      in addition, two of these earnings announcements provided the market with information that did not substantially alter analysts' expectations, and these were followed by no statistically significant price movements in Flowserve's stock.

8.      The aforementioned event analyses clearly show that Flowserve's stock price reacted quickly to new material information, as one would expect given the high trading volume in

---

[1]     *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

- 3 -

Flowserve's common stock, the substantial analyst coverage of the Company, and the significant presence of sophisticated institutional investors who would analyze the information, trade on the information, thereby ensuring that the information became reflected in the stock price.

9.     Martin claims that my event study methodology is "critically flawed" without identifying a single instance where new material information was not followed by a significant price movement. (Martin Rebuttal Report, page 3) This proves particularly curious, as she employs a virtually identical event study methodology, yielding virtually identical results for the days she analyzes. Nonetheless, below is a summary of Martin's criticism of my methodology, as well as an explanation of why these criticisms do not alter my opinion that the market for Flowserve's common stock during the Class Period was efficient.

10.     First, Martin claims that "the sample of observations [referring to the two events I am analyzing] must include what is known as a 'control group.'" (Martin Rebuttal Report, page 3) This statement is completely incorrect and not supported by the academic papers she quotes. It should be noted that her quotes relate to treatment groups used in medical research – not control periods in event studies used for investment research. This may explain some of her confusion regarding how event studies are conducted.

11.     The events I chose to analyze are necessarily different from the event study control group. This is the proper approach to compare the events to my control group and determine statistical significance. Like Martin, my control group includes the market adjusted price movements during the one year period prior to the Class Period, which, incidentally, is the same control period Martin uses. We also used virtually the same industry index when determining the abnormal returns in Flowserve's stock price. Consequently, any of Martin's criticisms regarding my event study apply with equal force to her own methodology.

- 4 -

12.    Second, Martin claims that without a "non-news control group, Mr. Steinholt cannot infer that Flowserve's price moves in response to news." (Martin Rebuttal Report, page 3) This is not a valid criticism. As with most academic event studies, Martin herself did not remove days with news stories from the control group. (Martin Rebuttal Report at 7) Furthermore, had I excluded news days from my control group, the abnormal returns would have been greater, and the statistical significance of the price movements I examined would have been more pronounced. If Martin does not like the results of my event study, or believes they are unreliable, she can use her own event study described on page 7 of the Martin Rebuttal Report - it yields virtually the same result.

13.    Third, Martin claims that "there is no reason to believe that the two dates selected by Mr. Steinholt are a representative sample." (Martin Rebuttal Report, page 3) I deliberately selected dates where new material information was disclosed so that I could test the price reaction to the new material information and determine whether or not the price reaction was consistent with an efficient market. I chose the two most obvious dates where new material information was disclosed and determined that the related price reactions were consistent with an efficient market. Furthermore, Martin does not identify a single alternative date that disproves my market efficiency conclusion. Additionally, in my rebuttal report, I examined the seven earnings releases during the Class Period. These event analyses confirm that Flowserve's common stock price reacted quickly to new material information on each of those dates as well, further invalidating Martin's claim that Flowserve's stock price did not respond to earnings announcements or reacted "in the opposite direction."

14.    Fourth, Martin also claims that I have "not shown that Flowserve's price responded 'fully' and 'quickly' to news." (Martin Rebuttal Report, page 4) She does not explain what she means by those terms, or what test she would propose to determine whether her benchmarks are met. In virtually every securities class action case in which I have been retained over the past 15 years, price movements have been analyzed (by experts for both defendants as well as plaintiffs) on a daily

- 5 -

basis using the daily closing prices. Based on my analysis of the daily closing prices, Flowserve's stock reacted quickly to new material information; daily returns all were statistically significant at the 95 percent level of confidence.

15.    Whether new information is fully reflected within one day, however, is a more complex issue.    The length of time it takes for material new information to become fully incorporated into the stock price depends on the nature of the information disclosed, how difficult it is to analyze the information, and the presence of subsequent information, such as analyst commentary, that also can influence the stock price. This is why academic event studies generally examine an event window of greater than one day. A study conducted by Martin's firm, NERA, analyzed the abnormal returns of 76 companies following announcements that were "unusual in nature." On average, NERA found that it would take from 1.1 to 1.6 days for such information to be fully incorporated into a stock's price.[2] This does not mean that markets are generally inefficient, just that certain news takes longer to analyze and, therefore, longer to become reflected in the stock price than other news.

16.    Fifth, Martin reiterates that her previous analyses provide evidence of inefficiency. In her original report, Martin opined that Flowserve's "stock price did not respond to earnings announcements and demonstrated price overreaction." (Original Martin Report, page 2) Her first analysis of earnings announcements is factually false, as detailed in my previous rebuttal report. Her second assertion is primarily a matter of data mining, also discussed in my prior rebuttal report. With respect to a rebound in Flowserve's shares following both the July 22, 2002 and September 27, 2002 disclosures, this has to be seen in context of the unusual nature of the disclosures made and the

---

[2]    Krivin, Patton, Rose and Tabak, "Determination of the appropriate event window length in individual stock event studies," NERA Working Paper, 2003.

- 6 -

analyst commentary the day following the disclosures. Martin fails to analyze either. She just makes the observation and raises the possibility that the observed price reaction may indicate an inefficient market. However, this does not contradict that, at each point in time, Flowserve's stock price reflected the publicly available information at that time, as the information was being analyzed by analysts and investors. This is different than an inefficient market where there's an absence of analysts covering the stock, sophisticated investors trading in the stock, resulting in new material information not being reflected in the stock price.

17.    Sixth, Martin finally claims that while "markets may by generally efficient, pockets of inefficiencies are widely believed to exist." (Martin Rebuttal Report, page 5) This argument is without merit. When pockets of inefficiencies appear in an open and well developed market, in which sophisticated investors are present, the sophisticated investors will exploit these inefficiencies by buying undervalued stocks or selling overvalued stocks, thereby eliminating the inefficiencies. In fact, this is the process that causes new material information to quickly become reflected in the stock price. A separate issue is that, for the past 35 years, academics have been divided over just how efficient the markets are, and more specifically, whether securities prices "correctly" reflect all publicly available information. Many papers have been written identifying apparent anomalies in the marketplace, and many of these assertions have later been rebutted by other academics in follow up research. As pointed out by Eugene Fama:

> Consistent with the market efficiency hypothesis that the anomalies are chance results, apparent overreaction to information is about as common as under-reaction, and post-event continuation of pre-event abnormal returns is about as frequent as post-event reversal. Most important, consistent with the market efficiency prediction that apparent anomalies can be due to methodology, most long-term return anomalies tend to disappear with reasonable changes in technique.[3]

---

[3]    *See* Eugene F. Fama, "Market Efficiency, Long-Term Returns, and Behavioral Finance," *Journal of Financial Economics*, Vol. 49 (1998).

- 7 -

APP146

18.     It is important to understand that the academic debate regarding how efficient the

capital markets are is not before the Court. The issue before the Court relates to the fraud-on-the-

market theory and concerns reliance and how new information is processed by the market, not the

issue of the market being "correct" in their valuation of securities. As the Court of Appeals pointed

out in *Polymedica*:[4]

>    The fraud-on-the-market theory is concerned with whether a market
> processes information in such a way as to justify investor reliance, not whether the
> stock price paid or received by investors was "correct" in the fundamental value
> sense.

19.     The above distinction is an important one. Academics may never agree about

whether the prices of publicly traded securities are "correctly" set by market participants, but that

does not mean that the prices do not reflect the publicly available information. In fact, substantial

trading activity, analyst coverage, and the presence of sophisticated investors will virtually ensure

that a stock price reflects all publicly available information. In the context of a paper arguing against

market efficiency, a leading defense expert admitted:

> There is almost no dispute, however, that for securities traded in open and developed
> markets as measured by the *Cammer* and *Krogman* criteria, it is reasonable for all but
> the most sophisticated investors to rely on the market prices. There is thus little
> dispute that with respect to such securities, reliance on the integrity of the market
> prices (and thus on the defendants' statements) is appropriately presumed.[5]

20.     Based on the above, as well as the analyses in my original report and previous

rebuttal report, it is my opinion that the market for Flowserve's common stock during the Class

Period was efficient.

---

[4]     *In re Polymedica Corp. Sec. Litig.*, 432 F.3d 27 (1st Cir. 2005).

[5]     Cornell and Rutten, "Market Efficiency, Crashes and Securities Litigation," Draft Working
Paper, (December 2005).

APP147

## III.    LOSS CAUSATION

21.    Martin claims that I have "not demonstrate[d] that Flowserve's price was materially inflated by the alleged misstatements." (Martin Rebuttal Report, page 6)  In my original report, I summarized the impact of Flowserve's restatements on net income.  I believe that these restatements are, in and of themselves, sufficiently large to be material, as the true financials would have been information that a reasonable investor would have wanted to know prior to making an investment decision.  The table below again shows the substantial impact of the restatements on net income:

|      | As Originally Reported | As Restated | Difference |
|------|-----------|-----------|-----------|
| 2000 | $13.2 million | $5.4 million | $7.8 million |
| 2001 | ($1.5 million) | ($16 million) | $14.5 million |
| 2002 | $53 million | $34.8 million | $18.2 million |

22.    In her Rebuttal Report, Martin first takes issue with my definition of materiality, calling it "non-authoritative." (Martin Rebuttal Report, page 6)  The "non-authoritative" source I quoted in my original report happened to be the Supreme Court of the United States.  As I stated in my original report, in *Basic*, the Supreme Court quoted *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976), which stated that a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision, or if it would have "significantly altered the 'total mix' of information made available" to the shareholder.[6]

23.    Martin then formulates what she calls the "economic definition of materiality," which she claims "requires that a statistically significant price change be observed in response to news,

---

[6]    *Basic*, 485 U.S. at 231-32 (quoting *TSC*, 426 U.S. at 449).

controlling for the movements of the market and industry." (Martin Rebuttal Report, page 6) First, materiality is a legal term not commonly used in economics. Second, the term statistical significance may relate to materiality, but it does not have meaning in this context unless the appropriate level of confidence is also defined, which she does not do.[7] Third, for someone who appears to require definitions to be accompanied by at least one "authoritative" source, the source of her definition is conspicuously absent.

24.     Rather than determining whether or not the massive restatement would have been considered important or material by investors, Martin analyzes whether or not there were any positive price increases in Flowserve's common stock following the alleged misstatements in the Complaint. She finds two statistically significant price increases on April 24, 2001 and October 23, 2001, but claims that "multiple statements were made by Flowserve to the market" on these dates and that I do not "analyze whether the alleged misstatements on these dates were disclosed to the market previously, making them merely confirmatory." (Martin Rebuttal Report, page 7) These statements are discussed in the Materiality section of my previous rebuttal report. Martin asserts her second point, that I must somehow analyze whether the false financials reported on these two dates may have been "disclosed to the market previously," without any supporting evidence. If the earnings had **[in fact]** been disclosed earlier, then Martin would be able to provide some press release or media account showing this. Of course, there is no such evidence supporting Martin's suggestion that the allegedly fraudulent financials were disclosed prior to the actual earnings announcements for the two quarters.

---

[7]     As noted by her colleagues at NERA: "It is not clear what level of statistical significance corresponds to a legal definition of materiality." Tabak and Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom: Working Paper (April 1999).

APP149

25.     While it is not necessary for me to analyze each alleged fraudulent misstatement to determine that the stock price was inflated during the Class Period, I do want to briefly comment on Martin's analysis of the February 6, 2001 earnings announcement that starts the Class Period. Following Flowserve's announcement of its inflated earnings on February 6, 2001, its stock price did not increase, it declined. Consequently, Martin claims that the inflated earnings announced were not material. However, the price declined, as I discussed in my previous rebuttal report, because the inflated earnings were still far below investors' expectations. In my opinion, Flowserve's stock price would have declined even more had the true earnings been disclosed on February 6, 2001 because such a disclosure would have been an even greater disappointment to investors than what was actually announced. Looking for a statistically significant price increase to determine materiality under this type of scenario is therefore inappropriate. This is specifically explained by one of Martin's colleagues at NERA:

> For example, suppose a company was expected to earn fifty cents a share but actually only earned forty cents. If the company falsely announced earnings of forty-five cents, the market will be disappointed and the stock price will fall, even though the company has overstated its earnings. Thus, stock price evidence to support an allegation of loss causation based on an inflated purchase price will only be readily available in cases where the defendant makes an affirmative misstatement relative to market expectations.[8]

26.     Based on the above, as well as my analyses in my previous reports, it is my opinion that the allegedly false and misleading information was material and increased investors' expectations regarding the Company's future prospects, thereby, causing Flowserve's shares to trade at artificially inflated prices during the Class Period.

---

[8]     Dr. David Tabak, "Loss Causation and Damages in Shareholder Class Actions: When It Takes Two Steps to Tango," NERA Working Paper, May 2004.

27.     Martin also claims that I rely on an incorrect interpretation of *Dura*. Specifically, she claims that, "in *Dura*, the Court found that a buyer must show that his *loss followed directly from a disclosure of fraud* and that, if the price of a security declined due to *unrelated factors* before the disclosure of any fraud, the buyer would be unable to demonstrate loss causation." (Martin Rebuttal Report, page 6, emphasis added) As I wrote in my initial report, according to *Dura*, "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss," because "if, say, the purchaser sells the shares quickly before *the relevant truth begins to leak out*, the misrepresentation will not have led to any loss." [9] (Emphasis added) *Dura* goes on to state: "We need not, and do not, consider other proximate cause or loss-related questions." Unlike Martin, I do not intend to provide a legal opinion regarding what the Supreme Court intended to mean; I simply assume that the Supreme Court meant what they actually stated in their *Dura* opinion.[10]

28.     The difference in our views can be demonstrated by examining plaintiffs' allegation that Flowserve failed to disclose that it was in violation of its debt covenants. It is undisputed that at least the analyst for Credit Suisse First Boston LLC ("Credit Suisse") stated in a research report that concerns over the Company's potential breach of its debt covenants was a significant factor causing the September 27, 2000 price decline. The report stated:

Credit Concerns Significant Factor in Equity Market Reaction

While working capital, cash flow, cost reductions, and the other usual Flowserve topics were covered on the company's call on Friday, many questions focused on the company's potential to breach its debt covenants – specifically its leverage ratio covenant.

---

[9]     *Dura*, 125 S. Ct. at 1631.

[10]    Regarding my quote from what Martin refers to as the "unpublished working paper," it is my understanding that it's publication is forthcoming in the April 2006 edition of Michigan State University Journal of Business and Securities Law.

- 12 -

APP151

29.    It is unclear to me how Martin can argue that a price decline relating to investors' concerns regarding potential breach of Flowserve's debt covenants is *unrelated* (using her definition above) to the alleged fraud surrounding Flowserve's violation of the debt covenants. The connection between the two seems obvious. However, Martin argues that the Credit Suisse report did not disclose the fraud relating to its violation of the debt covenants because: a) it was not disclosed "that Flowserve had historically violated any debt covenants;" b) the Credit Suisse analyst believed "Flowserve [would] not breach its financial covenants in 2003;" and c) that "other analyst reports also indicated that Flowserve was not expected to violate its debt covenants." (Martin Rebuttal Report, page 8) While Flowserve never admitted to violating the debt covenants, its credibility was severely tarnished by the September 27, 2002 disclosure, as discussed in my original report, and investors became concerned about the Company's potential breach of its debt covenants. In other words, the "relevant truth [began] to leak out."[11] That some analysts may have been at odds with investors, believing that the Company would not breach its debt covenants, is irrelevant so long as a) investors began to understand the true financial condition of Flowserve; and b) the stock price declined as a consequence. Martin does not dispute either of these points.

30.    As I understand Martin's reasoning, she is effectively arguing that the disclosure at the end of the Class Period did not reveal the fraud itself. The disclosure did, however, reveal the true state of the Company's financial condition and outlook that previously had been concealed by the alleged fraud. Consequently, the price decline at the end of the Class Period is related to relevant truth being revealed, and, thus, the alleged fraud itself.

---

[11]    *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005).

## IV.    CONCLUSION

31.    Based on the above, the issues raised in the Martin Reports do not change my opinions that: a) Flowserve's common stock traded in an efficient market; and b) the allegedly false and misleading statements caused economic damages to investors who purchased Flowserve common stock during the Class Period.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 30th day of May, 2006, at San Diego, California.

Respectfully submitted,

BJORN I. STEINHOLT, CFA

- 14 -