2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| JERRY RYAN, On Behalf of Himself and All Others Similarly Situated,<br><br>           Plaintiff,<br><br>  vs.<br><br>FLOWSERVE CORPORATION, et al.,<br><br>           Defendants. | § § § § § § § § § § § § | Civil Action No. 3:03-CV-01769-B<br>**(Consolidated with 3:03-CV-01827-M; 3:03-CV-01846-M; 3:03-CV-02079-M)**<br>**ECF** |

**DECLARATION OF JOY ANN BULL IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**

I, JOY ANN BULL, declare as follows:

1.      I am a member of the firm of Robbins Geller Rudman & Dowd LLP.  I am submitting this Declaration in support of an award of attorneys' fees and expenses.

2.      Attached hereto is a true and correct copy of the following:

Exhibit 1:     Stephanie Plancich, Ph.D., Svetlana Starykh, *2008 Trends in Securities Class Actions* (NERA Dec. 2008); and

Exhibit 2:     Ronald I. Miller, Ph.D., Todd Foster, Elaine Buckberg, Ph.D., *Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements, is Stabilization Ahead?* (NERA Apr. 2006).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 7th day of April, 2010, at San Diego, California.

s/ Joy Ann Bull
JOY ANN BULL

# EXHIBIT 1

NERA
Economic Consulting



# 2008 Trends in Securities Class Actions

*Annual Filings Are at the Highest Level in Six Years, Driven by the Credit Crisis, While Median Settlement Values Stay Steady*

Stephanie Plancich, PhD

Svetlana Starykh

December 2008

How Markets Work℠

# Annual Filings Are at the Highest Level in Six Years, Driven by the Credit Crisis, While Median Settlement Values Stay Steady





Stephanie Plancich, PhD, and Svetlana Starykh[1]

**December 2008**

## Introduction

As the securities markets continued to exhibit extraordinary volatility and the economy suffered through a recession in 2008, securities class action litigation intensified. For the year 2008 (through December 14, 2008), 255 securities class actions were filed, up from a 12-year low of only 131 filings in 2006 and 195 in 2007.

The credit crisis drove the surge in filings: 110 cases filed in 2008 had some tie to the credit crisis, up from 40 in 2007. Of the 110 cases related to the credit crisis, 20 were cases related to failures in the auction-rate securities market, and most of these cases were filed in the first half of the year. In addition, almost 50% of the 2008 cases were filed against defendants in the financial sector, up from about 16% of cases in the 2005-2006 period.

While filings have steadily increased from 2006 through 2008, a similar pattern has not been observed in median settlement values. Median settlements have remained relatively stable, staying below $10 million. In 2008, the median settlement resolved for $7.5 million, slightly below the 2007 median of $9.4 million, and above the 2006 median settlement of $7.0 million. As always, a small number of large settlements causes average settlements to exceed median settlements; the 2008 average settlement of $38 million is substantially higher than the median.

Given the surge in credit crisis-related filings, are average and median settlement sizes also likely to grow in the future as these cases begin to resolve? Two opposing factors may come into play with regard to these credit crisis case resolutions. On one hand, the investor losses associated with credit crisis cases filed in 2008 are very large—the median investor loss for such a case is almost $3.5 billion, compared to a median loss of only $387 million for a non-credit crisis case filed this year. Historically, investor losses have been positively correlated with settlement size, so big losses may be an indicator of big settlements to come. On the other hand, defendants with "deep pockets" are the ones who can afford big settlements, and the credit crisis has dramatically shrunk the size of many defendants' pockets.

[1]   This edition of NERA's research on recent trends in shareholder class action litigation expands on previous work by our colleagues Lucy Allen, Elaine Buckberg, Frederick C. Dunbar, Todd Foster, Vinita M. Juneja, Denise Neumann Martin, Ronald I. Miller, and David I. Tabak. We gratefully acknowledge their contribution to previous editions as well as this current version. The authors also thank Jake George, John Montgomery, and David I. Tabak for helpful comments on earlier drafts of the paper. In addition, we thank Nicole Roman, Carlos Soto, Nii Nookwei Tackie, Maria Tarasyuk, Steven D. Towler, and many other NERA researchers for further assistance. These individuals receive credit only for improving this paper; all errors and omissions are ours.

## Securities Class Action Filings

Through December 14, 255 federal securities class actions had been filed in 2008, continuing last year's substantial rebound from the recent low of 131 cases in 2006.² In fact, if we exclude the unusual cases—those that are related to the IPO securities litigation, analyst cases, and mutual fund market timing cases (i.e., the "Other Cases" in Figure 1)—filings in 2008 are at a 10-year high. If filings continue to come in over the last two weeks of 2008 at the same pace, the total number of cases would reach 267.

Credit crisis-related cases made up approximately one-fifth of all filings in 2007, but make up almost half of the 2008 filings. Options backdating cases peaked in 2006, but still continue to appear, with five brought in 2008.

The first cases related to the subprime meltdown were filed in February 2007. By the second half of 2007, subprime cases were being filed at an increasing pace, and, as the economy moved into a full-blown credit crisis in 2008, other credit-related cases were filed as well (Figure 2). For example, within the broader category of cases related to the crisis, auction-rate securities-related cases peaked in the first half of 2008, with seven filed in the first quarter and nine in the second quarter of the year following the massive failure of auctions in late February.³ Although the pace of auction-rate securities-related filings has slowed since then, these cases have not disappeared, with four filed in the second half of 2008. While the first surge of these cases was filed against the banks and broker-dealers involved in the creation of

**Figure 1. Federal Filings**
January 1, 1996 – December 14, 2008



Note: Other Cases include IPO laddering, mutual fund market timing, and analyst cases.

² Data on filings come from multiple sources, including RiskMetrics Group/Securities Class Action Services (SCAS), Factiva, Bloomberg, FactSet, SEC filings, and the public press. In compiling our data, we seek information on all unique class actions alleging damages with regard to the purchase, ownership, or sale of securities. Most of our summary statistics below are based on data for cases filed in US Federal Courts. Until cases are consolidated, we report multiple filings that potentially are related to the same alleged fraud if complaints are filed in different Circuits. Similarly, until cases are consolidated, we report multiple filings if different cases are filed on behalf of investors in common stock and other securities. If cases are ultimately consolidated, the data are adjusted.

74



Figure 2. **Federal Filings: Six-Month Intervals**

January 1, 2002 – December 14, 2008

Note: Other cases include IPO laddering, mutual fund market timing, and analyst cases.

markets for auction-rate securities, at least one "indirect" case has subsequently been filed against a non-bank company, NextWave Wireless Inc., which held these securities in its portfolio. This indirect channel may be a source of additional filings in the weeks to come.

**Filings by Circuit**

In this year, as in prior years, cases have been concentrated in the Second and the Ninth Circuits (Figure 3).

The particular spike in the Second Circuit cases in 2008 stems directly from the credit crisis: both auction-rate securities cases and other credit crisis-related cases have been clustered in this Circuit, which includes New York, Connecticut, and Vermont.

## Credit crisis-related cases made up approximately one-fifth of all filings in 2007, but make up almost half of the 2008 filings.

---

[2]   See NERA working paper, "Auction-Rate Securities: Bidder's Remorse?" by Stephanie Lee. This NERA study can be found at: http://www.nera.com/image/PUB_Auction_Rate_Securities_0708.pdf

Figure 3. **Federal Filings by Circuit, Year, and Type of Case**
January 1, 2006 – December 14, 2008



Figure 4. **Cases Related to Credit Crisis by Circuit**
January 1, 2007 – December 14, 2008



76

While in 2007 only eight Circuits had been affected by the subprime meltdown, in 2008 all Circuits have had at least one credit crisis-related case (Figure 4).

## Filings by Sector

In 2005 and 2006, securities class action filings were spread widely across a number of industrial sectors. As the subprime lending markets experienced a meltdown and a full-blown credit crisis began to emerge in 2007, an increasing fraction of all filings were made against firms in the financial sector.

This year, a huge spike in filings occurred against companies in the finance sector, as the credit crisis continued and a number of firms in the finance industry collapsed. Over 120 filings in 2008—almost 50% of all filings—named a company in the finance sector as the primary defendant.

Although the most dramatic trend in filings has been in the finance sector, other sectors also saw continued filing activity. For example, even though the health technology sector has lost ground to the finance sector as a percentage of all filings, the *level* of filings in this sector has slightly increased over the past few years: there were only 19 filings against health technology firms in 2006 and 29 filings in 2008.

For the electronic technology and technology services sectors combined, on the other hand, both the number of filings and the percentage of all filings in that sector are lower in 2008 than in the prior three years.

For some cases, the primary defendant may not be in the financial sector, but a co-defendant in that sector may also be named. Thus, the financial services sector is likely to be even more embroiled in securities class action litigation in 2008 than indicated by the pattern in Figure 5.



Figure 5. **Percent of Filings by Sector**
January 1, 2005 – December 14, 2008



# Nearly 50% of all filings in 2008 named a company in the finance sector as the primary defendant.

Specifically, 65 cases filed in 2008 so far have had some financial institution co-defendant named in the complaint. This is a substantial increase from the number of cases with a financial sector co-defendant from the prior year: 9% in 2007 had a financial institution co-defendant, while 25% of cases filed in 2008 name a financial institution as a co-defendant.

## Types of Allegations[4]

Approximately 25% of the allegations in cases filed in 2008 are related to accounting, which has been a fairly steady proportion of allegations over the past few years (Figure 6). On the other hand, over 40% of the allegations in 2008 involve product and operational defects, an increase from prior years. Again, this shift is driven by the credit crisis, because a number of these cases relate to alleged failures of financial products to perform as promised.

## Trends in Resolutions

While filings have increased over the last two years due to the credit crisis, there has been no clear increasing or decreasing trend in the pattern of resolutions. In fact, most credit crisis-related cases have not yet reached any final resolution, since it can take months or even years for cases to be dismissed, tried, or settled.



Figure 6. **Allegations in Federal Filings**
January 1, 2008 – December 14, 2008



Figure 7. **Status of 235 Federal Shareholder Class Actions Filed in 2000**

---

[4] Most securities class action complaints have multiple allegations. All allegations are included in this analysis, such that the total number of allegations exceeds the total number of filings.

Of the 1,121 cases filed between December 14, 2001 and December 14, 2006, 729 have resolved. Almost 45% of these resolved cases ended with a dismissal, and 55% reached a settlement. However, 392 of the filings from this time period remain pending, so these statistics may differ from the ultimate mix of resolutions for all cases.

Because it may take several years for cases to reach a resolution, we have tracked a single cohort of filings over time to see how they ultimately are resolved (Figure 7). Of the cases filed in 2000, 59% have reached final settlement, 1% have reached a partial settlement, and 33% have been dismissed. Note that 7% of these 2000 filings either remain pending or have been abandoned by the plaintiffs, so even after eight years it is impossible to tell the final mix of resolutions for these cases.

## Verdicts

While the vast majority of securities class action cases result in dismissal or settlement, a tiny fraction of cases ultimately go to trial. For example, only four of the cases filed in 2000 have gone to trial, and all settled with at least one defendant during the trial. A full list of securities class actions that went to trial following the PSLRA is included in Table 1. A brief summary of outcomes for these cases is illustrated in Figure 8.

Once cases go to trial, they do not always reach an unambiguous plaintiff or defense verdict. Instead, one or more of the defendants might settle during the trial, or a verdict may be reached for one party but later overturned.

For example, in January 2008 the case against Apollo Group resulted in a jury verdict for the plaintiffs of approximately $280 million. In August of this year, however, this verdict was overturned by US District Court Judge Teilborg, who ruled that the plaintiffs had "failed to prove that the company's actions caused any harm."[5]

Figure 8. **Twenty-One Shareholder Class Actions That Went to Trial After PSLRA**



The vast majority of securities class action cases result in dismissal or settlement; a tiny fraction ultimately go to trial.



---

[5] "Apollo Group Wins Reversal of $280M Verdict," by Christine Caulfield, *Law 360*, Portfolio Media, Inc., August 5, 2008.

Table 1. **Twenty-One Shareholder Class Actions That Went to Trial after PSLRA**

| Case | Federal Circuit | File Year | Trial Year[1] |
|---|---|---|---|
| **I. Verdict for Defendants** | | | |
| 1 Apollo Group, Inc.[2] | 9 | 2004 | 2007 |
| 2 Biogen Inc. | 1 | 1994 | 1998 |
| 3 Everex Systems Inc.[3] | 9 | 1992 | 2002 |
| 4 Health Management, Inc. | 2 | 1996 | 1999 |
| 5 JDS Uniphase Corp. | 9 | 2002 | 2007 |
| 6 Thane International, Inc.[4] | 9 | 2003 | 2005 |
| 7 Tricord Systems, Inc. | 8 | 1994 | 1997 |
| **II. Verdict for Plaintiffs** | | | |
| 1 Claghorn / Scorpion Technologies, Inc. | 9 | 1998 | 2002 |
| 2 Computer Associates International, Inc. | 2 | 1991 | 2000 |
| 3 Helionetics, Inc. | 9 | 1994 | 2000 |
| 4 Real Estate Associates, LP | 9 | 1998 | 2002 |
| 5 US Banknote Corp.[5] | 2 | 1994 | 1997 |
| **III. Mixed Verdict** | | | |
| 1 Clarent Corp.[6] | 9 | 2001 | 2005 |
| 2 ICN Pharmaceuticals, Inc.[7] | 2 | 1987 | 1996 |
| **IV. Settled During Trial[8]** | | | |
| 1 AT&T | 3 | 2000 | 2004 |
| 2 First Union National Bank / First Union Securities / Cyprus Funds | 11 | 2000 | 2003 |
| 3 Globalstar Telecommunications, Ltd. | 2 | 2001 | 2005 |
| 4 Heartland High-Yield / Short Duration High-Yield Municipal Bond Funds | 7 | 2000 | 2005 |
| 5 WorldCom | 2 | 2002 | 2005 |
| 6 Safety-Kleen Corp. (Bondholders Litigation)[9] | 4 | 2000 | 2005 |
| **V. Default Judgment** | | | |
| 1 Equisure Inc.[10] | 8 | 1997 | 1998 |

Notes.
Until otherwise noted, all these cases went to a jury trial. Data are from case dockets.

[1]   Trial year represents a year in which a jury trial began.
[2]   On 8/4/2008 judge overturned a 1/16/2008 jury verdict for plaintiffs. On 8/29/2008 plaintiffs filed an appeal.
[3]   1998 verdict for defendants was reversed and remanded by the Ninth Circuit Court of Appeals; retrial again yielded a verdict for defendants.
[4]   Bench trial verdict was reversed and remanded by the Ninth Circuit Court of Appeals; has not yet been retired.
[5]   Judge subsequently vacated the jury verdict and approved a settlement.
[6]   Chairman of Clarent liable, Ernst & Young not liable.
[7]   Hung jury.
[8]   At least one defendant settled after the trial began, but prior to judgment.
[9]   Some director-defendants settled during the trial; default judgment against CEO and CFO who failed to show up for trial.
[10]  Default judgment against Equisure Inc. who failed to show up for trial.



80

## Settlements

While filings have been increasing sharply over the past two years, median settlements have been relatively steady (Figure 9). Looking over the longer history starting in 1996, median settlements have increased from around $4 million up to $8 million in 2008.[6]

Over the 2005-2008 year period, median settlements ranged from $7.0 million to $9.4 million. While median values increased between 2006 and 2007, they dropped between 2007 and 2008, so, at this time, there is no evidence of an increasing trend in median settlements.

While filings have been increasing sharply over the past two years, median settlements have been relatively steady. ... at this time, there is no evidence of an increasing trend in median settlements.

Figure 9. **Median Settlement Value ($MM)**
January 1, 1996 – December 31, 2008



---

[6]    Unless otherwise noted, tentative settlements and cases in which not all non-dismissed defendants have settled are not included in settlement statistics. We define settlement year as the year in which the first court hearing related to the fairness of the settlement occurred. For cases with multiple partial settlements, a settlement year is determined by a court fairness hearing date of the last partial settlement that concludes the case.

# There has been substantially more variation in average settlements. The annual average has ranged from $21 million to $82 million during 2003-2008.

Although median settlements have been relatively stable in recent years, there has been substantially more variation in average settlements (Figure 10). The average settlement over the years from 2003 to 2008—the post-Sarbanes-Oxley-Act period—has been $45 million, notably higher than the pre-Sarbanes-Oxley average of $17 million and also above the 2008 average of $38 million. The annual average has ranged from $21 million to $82 million over this six-year period.

Figure 10. **Average Settlement Value ($MM), All Cases**
January 1, 1996 − December 31, 2008





8 2

These average values can be extremely sensitive to the inclusion of large outlier settlements. Removing all settlements of over $1 billion, the 2003-2008 average settlement drops to $26 million, and the range of settlement averages across years becomes much tighter (Figure 11).

The 2008 final settlement of $1.04 billion for McKesson HBOC, Inc. is an example of such an outlier. Removing this settlement from the calculation drops the 2008 average from $38 million down to $29 million, below the 2007 average of $31 million.

Figure 11. **Average Settlement Value ($MM), Excluding Settlements Over $1 Billion**
January 1, 1996 – December 31, 2008



Note: Average settlement shown without final settlements over $1 billion: the 2000 Cendant, 2005 WorldCom, 2006 Royal Ahold, AOL Time Warner, two Nortel Networks, and 2008 McKesson HBOC Inc. settlements.



More generally, the distribution of settlement values has a fairly consistent shape over the past few years (Figure 12). Over 50% of cases have settlements for less than $10 million, and 10% or less have settled for more than $100 million. In 2008, only 6% of cases settled for more than $100 million.

### Investor Losses and Settlements

NERA has examined the relationship between settlement size and various case attributes for cases filed since the passage of the PSLRA. We find that investor losses, which can be calculated using publicly available data, historically have been the single most powerful determinant of settlements, explaining approximately 50% of their variation, controlling for other characteristics of the case.[7]

While investor losses are strongly correlated with settlement amounts, the two do not move together at a one-to-one ratio. Instead, as investor losses increase, settlements increase at a much lower rate: a 1.0% increase in investor losses results in an approximately 0.4% increase in the size of the expected settlement, other factors being held constant (Figure 13).[8]

Figure 12. **Distribution of Settlement Values ($MM)**
January 1, 2006 – December 31, 2008



---

[7]    Investor losses are measured by comparing a company's return to the return on the S&P 500 over the class period, and by using the proportional decay trading model to estimate the number of affected shares of common stock. We use investor losses as a crude proxy for plaintiff-style damages. The relationship between settlement values and investor losses is estimated in logs.

[8]    This relationship between investor losses and settlements is based on NERA's settlement prediction model, controlling for other case characteristics and overall price inflation. This model explains almost 64% of the variation in settlements, across almost 800 cases filed after January 1, 1996 and settled through June 30, 2008.

84

Another way to look at the relationship between investor losses and settlement values is to compare the ratio of these two numbers for cases with losses of different amounts. Holding all other case characteristics constant, at their respective means, a case with investor losses of $100 million is expected to have a settlement that is around $5.1 million, or 5.1% of investor losses. A case with $1 billion in investor losses is expected to settle for $12 million, only 1.2% of losses (Figure 14).

Figure 13. **As Investor Losses Rise, Expected Settlements as a Percent of Those Losses Decline**



Figure 14. **Expected Settlement Rises More Slowly Than Investor Losses**





Over a longer horizon, there has been a gradual increase in the investor losses of settled cases. A decade ago, the median investor loss estimate for a settled case was around $120 million. This year, the median investor loss estimate for a settled case has been almost $340 million (Figure 15).

A decade ago, the median investor loss estimate for a settled case was around $120 million. This year, the median investor loss estimate for a settled case has been almost $340 million.

Figure 15. **Median Investor Losses and Median Ratio of Settlement to Investor Loss**
January 1, 1996 – December 31, 2008



Focusing on very recent trends, we do not see any increase in the median investor loss for cases resolved in 2008 compared to the 2005-2007 period. Like median settlement amounts, median investor losses have been relatively stable over the past few years. Thus, the ratio of median settlements to investor losses, which had been as high as 7% back in 1996, has also stayed relatively steady in the 2-3% range over the past few years.

## Top 10 Settlements

While the majority of settlements over the past decade have been less than $10 million, a small number of "mega-settlements" have dominated the news and had a significant impact on annual average settlement values. The top 10 securities class action settlements of all time are listed in

Table 2. All but one of these settlements exceeded $1 billion.

Three of the settlements on the top 10 list are shown with 2008 as a settlement year, but only one of these—McKesson HBOC, Inc.—was finalized in 2008. The other two 2008 settlements have not yet been finalized: although many parties have reached partial settlements in the Enron case, not all defendants have finalized settlements at this time, and the $925 million UnitedHealth Group settlement is still a tentative settlement.

In total, these top 10 settlements add up to more than $28 billion. Note that over $13 billion, or 47%, of this aggregate settlement amount was paid by the "deep pockets" of financial institution co-defendants.



**Table 2. Top 10 Shareholder Class Action Settlements**

| | | | | Settlement with Financial Institution Co-Defendant(s)[1] | |
| | | Settlement Year | Total Settlement Value ($MM) | Value ($MM) | Percent |
| Ranking | Company | | | | |
|---|---|---|---|---|---|
| 1 | Enron Corp.[2] | 2008 | $7,242 | $6,903 | 95% |
| 2 | WorldCom, Inc.[3] | 2005 | 6,158 | 6,004 | 98% |
| 3 | Cendant Corp.[4] | 2000 | 3,561 | 342 | 10% |
| 4 | Tyco International, Ltd.[5] | 2007 | 3,200 | n.a. | n.a. |
| 5 | AOL Time Warner Inc. | 2006 | 2,650 | n.a. | n.a. |
| 6 | Nortel Networks (I) | 2006 | 1,143 | n.a. | n.a. |
| 7 | Royal Ahold, NV | 2006 | 1,100 | n.a. | n.a. |
| 8 | Nortel Networks (II) | 2006 | 1,074 | n.a. | n.a. |
| 9 | McKesson HBOC Inc. | 2008 | 1,043 | 10 | 1% |
| 10 | UnitedHealth Group[6] | 2008 | 925 | n.a. | n.a. |
| | **Total** | | $28,096 | $13,259 | 47% |

Note that for this summary table only, tentative and partial settlements are included for comparison, and "Settlement Year" in this table represents the year in which the last settlement—whether partial or final—had the first fairness hearing. For partial tentative settlements "Settlement Year" is the year in which this settlement was announced.

[1]  If "n.a.," either the case did not have an underwriting co-defendant, or none of the settlement value in column (4) was paid by an underwriting co-defendant.
[2]  This settlement includes seven partial settlements and one tentative partial settlement.
[3]  The settlement value incorporates a $1.6 million settlement in the MCI WorldCom TARGETS case.
[4]  The settlement value incorporates a $374 million settlement in the Cendant PRIDES cases.
    Settlement in the Cendant PRIDES I case was a non-cash settlement valued at $341.5 million.
[5]  This settlement is a partial settlement.
[6]  This settlement includes two partial tentative settlements.

## Looking Forward

While filings over the last 18 months have been dominated by credit crisis-related cases, it is too soon for many of these cases to have reached resolution. When these cases do start to resolve, what are the settlements likely to be?

Figure 16. **Median Investor Losses ($MM) for Cases Related to the Credit Crisis and Other Cases Filed in 2008**



Note: Cases related to the credit crisis include one auction-rate securities case. Other cases include standard and options backdating cases.

Two forces may pull these future settlements in opposite directions. First, the investor losses associated with credit crisis cases are high. As mentioned above, investor losses historically have been the single most important predictor of settlement size. For the median credit crisis case filed in 2008, the investor losses are almost $3.5 billion, compared to a median of $387 million for other, non-credit crisis cases filed this year (Figure 16).

For context, median investor losses for cases *settled* in the past four years have been in the $300 to $400 million range—corresponding to median settlements of less than $10 million—similar to the range of median investor losses on all cases *filed* in 2005 and 2006. Overall median investor losses for filed cases have grown in the last two years. Median investor losses for cases filed in 2007 were over $400 million, and the median investor losses for all cases filed in 2008 are $490 million (Figure 17).

The second force, which may reduce future settlements, is the extent of the "deep pockets" of defendant companies. Historically, indicators of the financial wherewithal of the defendant have been positively and significantly correlated with settlement values: controlling for a number of other factors (although not the merits of a particular case), defendants with higher market capitalization have higher settlements, and companies that are bankrupt or have share prices of less than $1 have significantly lower settlements. As noted above, a substantial fraction of the top 10 settlement payouts have been made from the deep pockets of financial institution co-defendants.



88

Figure 17. **Federal Filings**
**Median Investor Losses ($MM) by Settlement and Filing Year**



## Conclusion

In the wake of this current credit crisis, many of the named defendants and co-defendants, particularly in the finance sector, may be bankrupt or have much smaller pockets at the time of settlement. This factor may put downward pressure on settlement values. As an early hint about this type of settlement pressure, rumors of a $700 million settlement for the IPO litigation against investment banks have circulated, down substantially from the $3 or $4 billion settlement allegedly on the table—and rejected by plaintiffs—in 2006.[9]

The credit crisis and turmoil in the financial sector have been correlated with a notable increase in securities class action filings, beginning in 2007 and continuing throughout 2008. Year to date, filings are at a six-year high, with 110 cases related to the credit crisis. But few of these credit crisis cases have yet to move very far through the resolution process, so it is too early to tell what impact these filings may have on settlement values and dismissal rates.

For now, median settlements remain relatively stable and below $10 million. Only time will tell if the huge investor losses for credit crisis filings may put upward pressure on median settlements in the future, or if the financial distress faced by defendant companies may pull median settlement values down.



---

[9] Specifically, "The investors' case was led by a six-attorney executive committee, headed by [Mel] Weiss. One committee member, Howard Sirota, said in an interview today that he pressed Weiss to accept a possible settlement of $3 billion or $4 billion, which, Sirota said, the banks appeared willing to pay. Weiss refused to consider anything less than $12.5 billion, Sirota said." David Glovin, "Financial Firms Near $700 Million IPO Suit Settlement", *Bloomberg.com*, October 28, 2008 (http://www.bloomberg.com/apps/news?pid=20601103&sid=a_k3emz_zIYl6refer=news). See also "Will $700 Million Finally Settle Decade-Old IPO Suit?" by Zach Lowe, *The AMLaw Daily*, October 29, 2008 (http://amlawdaily.typepad.com/amlawdaily/2008/10/will-700-millio.html).

# EXHIBIT 2

# Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements, is Stabilization Ahead?

Ronald I. Miller, Ph.D., Todd Foster, Elaine Buckberg, Ph.D.[1]
April 2006

## Top Ten Shareholder Class Action Settlements
As of March 1, 2006

| Ranking | Company | Year | Settlement Value ($MM) |
|---|---|---|---|
| 1 | Enron Corp.* | 2005 | $7,144 |
| 2 | WorldCom, Inc. | 2005 | 6,156 |
| 3 | Cendant Corp. ** | 2000 | 3,528 |
| 4 | AOL Time Warner Inc.* | 2006 | 2,650 |
| 5 | Nortel Networks*** | 2006 | 2,474 |
| 6 | Royal Ahold, NV*** | 2006 | 1,100 |
| 7 | McKesson HBOC Inc.*** | 2005 | 960 |
| 8 | Lucent Technologies, Inc. | 2003 | 517 |
| 9 | BankAmerica Corp.; NationsBank Corp. | 2002 | 490 |
| 10 | Dynegy Inc. | 2005 | 474 |

   * This is a partial settlement including only some defendants.
   ** The settlement value incorporates a $341 million settlement in the Cendant PRIDES case.
   *** This is a tentative settlement.

## Settlement Records Keep Toppling

With CIBC's $2.4 billion settlement, the total settlement pool for the Enron shareholder class action became the largest ever at $7.1 billion, passing the $6.2 billion mark set by WorldCom only months earlier.[2] CIBC's contribution exceeded its 2004 earnings. Because some of the other Enron defendants, including more of Enron's bankers, have not yet reached settlements the final tally may rise much higher. The Enron settlement, though still incomplete, nearly doubles the pre-2005 record in Cendant, which reached $3.5 billion.[3] In the remarkable cases of both Enron and WorldCom, outside co-defendants have financed nearly the whole settlement.

The WorldCom and Enron settlements share a common characteristic of the recent mega-settlements: they compensate enormous investor losses. In the case of WorldCom, the investor losses are larger by a substantial multiple than for any other settled case filed since 1991. Investor losses, a simplified plaintiffs' style measure of damages, is the single most powerful predictor of settlement size.[4] The recent huge settlements have been associated with huge losses.

In 2005 and the first two months of 2006, the list of the ten largest shareholder class action settlements was almost completely rewritten. Seven slots on the list are now filled by 2005 and 2006 settlements. As of 2004, Cendant was the only settlement larger than one billion dollars. Now there are six. In what will surely be chilling news to non-United States issuers already wary of being embroiled in U.S. litigation, two of those six settlements, those of Nortel Networks of Canada and Royal Ahold N.V. of the Netherlands, involved foreign companies.[5] The Nortel settlement exceeds the previous record for a foreign issuer, Daimler-Chrysler, by a factor of more than eight.

### Federal Filings
January 1991 – December 2005



## Filings Fall in 2005: A Dip or a Trend?

In 2005, plaintiffs filed 209 cases in Federal Courts, substantially fewer than the 247 standard filings in 2004 and the post-Private Securities Litigation Reform Act ("PSLRA") average of 238 standard filings each year.[6] This is the lowest number of federal filings since 1997, when filings were depressed by a move to state courts by plaintiffs seeking to avoid the constraints of the PSLRA.

The low rate of filings in 2005 is evidence that the surge in filings that started in the late 1990s has lost momentum, but it is far too early to conclude that there is a downward trend. First, statistical testing finds that the 2005 dip is not statistically different from either the post-PSLRA average or from a longer-term trend. Second, the drop is far from evenly distributed: almost all of the difference between the 2004 and 2005 totals is accounted for by a sharp fall in filings in the Ninth Circuit.

One possible cause of this drop is that Sarbanes-Oxley ("SOX"), passed in July 2002, has had enough time to induce an improvement in corporate governance, prevented fraud, and thus reduced the number of resulting shareholder class actions. But if the beneficial effects of SOX were really the root cause of the slowdown in filings, we would have expected the fall in filings to be much more evenly distributed across the circuits. It seems unlikely that corporate governance was much more improved on the West Coast than in the rest of the country. Some of the drop may be accounted for by the collapse of the high-tech bubble. Reflecting the mix of industries on the West Coast, many Ninth Circuit filings are against issuers in high-tech industries. There has been some drop in filings against high-tech issuers as compared to 2004, but insufficient to explain the overall drop in filings. The most likely explanation for the remainder of the drop is simply random year-to-year variation.

2

## Standard Federal Filings By Circuit
2004 vs. 2005



Based on the 2003–2005 filing rate, we estimate that over a five-year period, the average public corporation has nearly a 10% probability that it will face at least one shareholder class action lawsuit.[7] The annual likelihood of a suit has risen approximately 8% from pre-PSLRA levels, from 1.8% to 1.9%. However, the increased likelihood of a suit is more than offset by the increased dismissal rate. The probability of a company facing a suit that survives a motion to dismiss has fallen from 1.4% in 1993–1995 to 1.2% over 2003–2005.

There has been some drop in filings against high-tech issuers as compared to 2004, but insufficient to explain the overall drop in filings.

## Companies Face a 2% Chance of Suit Each Year

|  | 1993–1995 | 2003–2005 | Change |
|---|---|---|---|
| No. of Publicly Traded Companies | 11,688 | 12,287 | 5.1% |
| Annual Filings | 210 | 238 | 13.7% |
| Probability of Shareholder Class Action (SCA) | 1.8% | 1.9% | 8.1% |
| Probability of Dismissal | 19.4% | 40.3% | 107.7% |
| Probability of SCA that Survives Motion to Dismiss | 1.4% | 1.2% | -19.9% |

3

93





Dismissal Rates By Circuit Within Two Years Of Filing

**Dismissals**

Dismissal rates have doubled since PSLRA.[8] Dismissals accounted for only 19.4% of dispositions for cases filed between 1991 and 1995. More recently, for cases filed between 1998 and 2003, dismissals have accounted for 40.3% of dispositions.[9] Our post-PSLRA dismissal rate may be slightly overstated, as it may include some dismissals without prejudice that will be reversed by amended and better-pled complaints or dismissals with prejudice that will be successfully appealed. There is no indication that dismissal rates have continued to rise after an initial adjustment to the tougher pleading provisions of PSLRA.

Dismissal rates vary by circuit. Both the Second and Ninth Circuits, which together receive the majority of cases, dismiss approximately 25% of cases within two years of the filing date. The Fourth Circuit has the highest rate, dismissing more than 40% of filings within two years.

Although high, it appears that settlements have reached a plateau as opposed to being on a continually rising trend.

4



**Average Settlement Value ($MM)**

**Settlements Reached New Highs in 2005**

Average settlement values hit a new peak in 2005, even excluding WorldCom and Enron.[10] The mean settlement value reached $24.3 million, barely exceeding the prior high of $23.7 million in 2002.[11] Including WorldCom would bring the average to nearly $71 million. Although high, with the addition of the results from 2005 it appears that settlements have reached a plateau that began in 2002 as opposed to being on a continually rising trend. Just as for filings, for average settlements there is some stabilization occurring, underneath the biggest of the mega-settlements.



**Median Settlement Value ($MM)**

**The Median Settlement Surged**

Median settlement values in 2005 hit $7.0 million, exceeding the past record by more than 15% and the 2004 level by one-third. The average settlement value tends to be dominated by the very largest settlements, while the median is more descriptive of typical cases. The driving factor behind this increase is the sharp reduction in settlements under $3 million, which accounted for nearly 45% of settlements in 1996 but constituted only 27% of settlements in 2005.

**Settlements May Fall From Their Peak**

There is good reason to expect that, apart from the biggest of the mega-settlements, average settlements will not rise further over the next two or three years and, instead, could even fall. Our analysis indicates that the high value of settlements in 2002–2005 is due to higher investor losses, not due to changes in the litigation environment. Many of the largest suits in this recent period have class periods ending during the collapse of the stock market bubble in 2000–2002. The large market losses that came with the end of this bubble have led to large settlements.

# Median investor losses for cases with class periods ending in 2000-2002 are far higher than for any other period, peaking at $402 million in 2000.

### Median Investor Losses
By End-of-Class Period Year ($MM)



The high settlements of recent years are likely to continue for several more years, as cases from the bear market proceed to settlement. Our analysis of median investor losses by end-of-class-period year for settled cases shows the point. Median investor losses for cases with class periods ending in 2000–2002 are far higher than for any other period, peaking at $402 million for class periods ending in 2000. For settled cases with class periods ending in 2003, of which there are 40 through 2005, median investor losses are only $194 million. As time passes we expect to see more settlements with more recent class periods which are likely to be smaller than those from the end of the bubble. But the backlog of earlier cases will keep settlements high for at least a few more years.

We find no statistically significant change in settlement values since the passage of Sarbanes-Oxley, once we control for other factors including investor losses.[12] Higher investor losses explain the rise in settlements, as we will discuss further below.

6

**9 6**



### Expected Settlements Rise More Slowly Than Investor Losses  ($MM)



| Investor Loss ($MM) | Settlement as % of Selected Investor Loss |
|---|---|
| $100 | 5.1% |
| 300 | 2.5% |
| 1,000 | 1.2% |

**Explaining Settlements**

NERA has estimated a statistical model for predicting settlements that explains over 60% of the variation in settlements, using data on cases filed after 1 January 1996. This model allows us to assess the impact of various lawsuit characteristics on settlement values. All the sensitivity measures described below are calculated controlling for other characteristics of the suit and consumer price inflation.

If the defendant firm is in bankruptcy or has a stock price of less than $1 per share at settlement, the settlement will typically be approximately 25% lower.

By far the biggest single driver of settlement values is investor losses, a measure of what investors lost over a class period relative to an investment in the S&P500. High investor losses in recent years completely explain the high average settlements we have seen. On average, a 1.0% increase in investor losses results in an approximately 0.4% increase in the size of the expected settlement, meaning that as investor losses rise, the ratio of settlement to investor losses falls.[13]

In 1996, the investor losses in an average settled suit were only $140 million. By 2005, average investor losses had ballooned to $2.6 billion. As well, median investor losses have been rising rapidly since 1996 and set a new record in 2005 at $332 million. But that was only a shade above the 2004 median of $329 million. Investor losses appear to be stabilizing, consistent with our analysis by end-of-class period. Similarly, the median share of settlements to investor losses also appears to be stabilizing after a long declining trend: in the early 1990s the median share was in excess of 5%, but since 2002 it has hovered between 2.5% and 3.0%.

Our investor loss measure covers only losses faced by holders of common stock. Settlement values increase dramatically in cases in which holders of other classes of securities—bonds, options, preferred stock—share in the settlement. Effectively, the claims of the holders of these other securities represent losses above and beyond those measured by investor losses.

## Investor Losses Have Risen More Rapidly Than Settlements—But May Be Stabilizing

Median Investor Losses ($MM)    —●—  Median Ratio of Settlement to Investor Losses



Settlements are greater when defendants have deeper pockets. For each 1% increase in the company's market capitalization on the day after the end of the class period, the typical settlement will increase by more than 0.1%. If the company's fortunes change before settlement, there may be less money to go around. If the defendant firm is in bankruptcy or has a stock price of less than $1 per share at settlement, the settlement will typically be approximately 25% lower. In addition, the involvement of outside co-defendants can lead to larger settlements. In cases with an accounting firm co-defendant, settlements increase by more than three-quarters, controlling for all other characteristics of the case.

Cases with accounting allegations result in higher settlements for other reasons too. The presence of allegations regarding accounting issues will raise average settlement values by approximately 20%. Settlements in cases in which accounting irregularities are admitted increase by a further half.

When the allegations of a suit are subject to official investigation, for example by the SEC or the New York Attorney General's Office, or result in a consent agreement or official punishment; settlements are higher. This outside evidence of the merits of a case leads to an approximately 25% increase in expected settlement value.

One of Congress's major goals for the PSLRA was to involve institutional investors as lead plaintiffs. In this the PSLRA has been effective, though the effect has taken time. In 2000, 14% of settled cases had an institutional lead plaintiff. In 2005, the figure was 38%. Controlling for other case characteristics, cases with an institutional investor lead plaintiff settle for a statistically significant one-third more. It is possible that institutional investors are more likely to choose to be involved in cases with greater merit, although we are controlling for other easily observable features of the suit. Alternatively, institutional investors as lead plaintiffs may retain more effective counsel, supervise counsel more effectively, and provide an independent contribution to strategy.

Our model also indicates that settlements increase by more than one-third if an IPO is involved. All such cases involve potential Section 11 claims, which may result in higher alleged damages than the accompanying 10b-5 claims and are also governed by different liability standards.

Only the health services sector pays markedly different settlements than do other industries. Settlements involving companies in the health services sector are typically one-third higher than settlements involving any other industry, controlling for other case characteristics. This finding may relate to the existence of concurrent billing fraud allegations against health services companies brought under the federal False Claims Act.

## Conclusion

The huge settlements from the Enron and WorldCom suits have grabbed attention in 2005, far surpassing any previous settlements. Another wave of mega-settlements has already begun in 2006. But for the greater mass of shareholder class action defendants, the situation appears to be stabilizing. We see evidence of stabilization in several key areas. An increase in federal filings followed passage of the PSLRA, but that trend has leveled. Average settlements reached a new high this year, but already cases with class periods ending after the end of the bubble-deflation are starting to bring the average down. Along with that leveling off, the share of settlements in investor losses has also stabilized after a long period of rapid decrease. It may be that for all the record-breaking settlements and all the headlines, shareholder class action litigation is entering a new period of normalcy.

## End Notes

1 This edition of NERA's research on recent trends in shareholder class action litigation expands on previous work by our colleagues Lucy Allen, Frederick C. Dunbar, Vinita M. Juneja, Denise Neumann Martin, Stephanie Plancich and David I. Tabak. We gratefully acknowledge their contribution to previous editions as well as this current version. In addition, the authors thank Christopher Enright and Christopher Lyon for supervising the research effort. These individuals receive credit only for improving this paper; all errors and omissions are ours.

2 CIB C's settlement, as well as JPMorgan Chase's for $2.2 billion and Citigroup's for $2.0 billion, all in the Enron litigation, have not yet received court approval.

3 Including the $341 million Cendant PRIDES settlement.

4 Investor losses are calculated in a standardized fashion and do not take into account the specific facts of any case apart from the stock price movements. Actual damages claimed by plaintiffs may be very different from investor losses in any particular case. Nonetheless, we have consistently found investor losses to be a powerful predictor of settlement values.

5 Neither of these settlements is yet court approved.

6 The post-PSLRA average is calculated for 1998-2005, thus excluding 1996 and 1997. There was a large drop in federal filings in 1996 and 1997, as plaintiffs filed in state courts to avoid the restrictions of PSLRA. As such, filings in those years are atypical. Standard filings are defined to exclude the laddering, analyst and mutual fund market timing cases.

7 The probability of not facing a suit is 97.9% per year. Assuming that the probability of facing a suit in each year is independent and compounding over five years yields a 90.7% chance of no suit, or a 9.3% chance of at least one suit, in five years.

8 Our dismissal statistics include summary judgments but exclude partial dismissals.

9 Because it is not uncommon for judges to take up to two years from the filing date to rule on motions to dismiss, it would be premature to evaluate dismissal rates of cases filed in 2004—2005. The increase in dismissals is statistically significant.

10 Enron is excluded because it is still incomplete and, for the purpose of calculating statistics, we date a settlement by the year it became complete and finalized.

11 Excluding Cendant from the 2000 average.

12 This is true for cases settled after SOX as well as for cases filed after SOX.

13 The illustrated figures represent the expected settlement as a percentage of investor loss, when all other predictive variables are at their mean levels. The expected settlement percentage may be very different for any particular settlement. NERA's statistical model of settlements allows calculation of the expected settlement percentage for individual cases with any specific set of characteristics.